HONORABLE WHITMAN L. HOLT

JAMES L. DAY (WSBA #20474)
RICHARD B. KEETON (WSBA #51537)
BUSH KORNFELD LLP
601 UNION STREET, SUITE 5000
SEATTLE, WA 98101
Tel: (206) 292-2110
Email: jday@bskd.com
Email: rkeeton@bskd.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

In re

KING MOUNTAIN TOBACCO COMPANY, INC.,

Debtor.

Case No. 20-01808

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS

TRUMAN J. THOMPSON declares as follows:

1. I am the Chief Executive Officer and Corporate Vice President of King Mountain Tobacco Company, Inc. ("King Mountain" or "Debtor"), the debtor-in-possession herein. I have personal knowledge of the facts set forth herein, and I am competent to testify to the same. I make this Declaration in support of the following emergency first day motions (the "First Day Motions"):

    a. Debtor's Emergency Motion for Order Authorizing Continued Use of Prepetition Cash Management System, Bank Accounts, and Escrow Accounts ("Cash Management Motion");

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 1

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11  Doc 5  Filed 09/25/20  Entered 09/25/20 18:32:04  Pg 1 of 11

b. Debtor's Emergency Motion for Authority to Pay Prepetition Payroll, Benefits, and Related Expenses ("Employee Wage Motion");

c. Debtor's Emergency Motion for Order Approving Adequate Assurance to Utilities ("Utilities Motion").

Capitalized terms not defined in this Declaration have their meanings as ascribed in the applicable First Day Motions.

2. King Mountain commenced its Chapter 11 case on September 25, 2020 (the "Petition Date"). The Debtor is operating its business and managing its affairs as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

## The Debtor's Operations and Community Impact

3. King Mountain Tobacco Company Inc. is a Native American owned and operated tobacco manufacturer based in White Swan, Washington, within the boundaries of the Yakama Nation Reservation. The Debtor was founded by Delbert and Trina Wheeler and incorporated in November 2005 under the laws of the Yakama Nation, and registered as a foreign corporation with the State of Washington.

4. The Yakama Nation Reservation has a low per capita income and high poverty rate. King Mountain is a significant employer on the reservation and provides full-time employment for more than 50 individuals.

5. The Yakama Nation has over 11,000 members. Those who choose to stay on the reservation face a host of economic and social challenges. Poverty, isolation, drug and alcohol abuse, lack of adequate resources to treat mental health issues, family problems and a youth suicide rate 2.5 times greater than the rate among other populations are but a sample of the problems facing the Yakama Nation today. King

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 2

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 2 of 11

Mountain has paid over $10 million in directly to the Yakama Nation taxes over the past 10 years, which has been used to assist the community in a variety of ways.

### The Master Settlement Agreement and Escrow Accounts

6. In November 1998, 46 states, five territories, and the District of Columbia agreed with certain major tobacco product manufactures to end years of litigation over tobacco-related illnesses by signing a Master Settlement Agreement (the "MSA"). Under the MSA, participating manufacturers ("PMs") agreed to restrict their advertising and marketing practices and make payments to participating states each year in perpetuity. However, not all tobacco product manufacturers are parties to the MSA (referred to as Non-Participating Manufacturers or "NPMs"), which would have given the NPMs a competitive advantage over PMs. Therefore, the MSA provided incentives for participating states to pass statutes (the "Escrow Statutes") applicable to NPMs, which generally require NPMs to deposit into an escrow account a specified sum per tobacco unit sold in a state on an annual basis. The deposits approximate what the NPMs would pay had they participated in the MSA. The escrow funds remain the property of the company making the escrow deposit.

7. To comply with the Escrow Statues, NPMs typically create a master account with a sub-account for each participating state, and to make periodic deposits into the accounts equal to the per-unit charge times the number of units sold within the state. An NPM is generally only allowed to withdraw funds from the escrow accounts to pay a judgment or settlement, or to get a distribution of any income made on the investment of funds in the escrow accounts. The funds deposited roll out of the account

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 3 of 11

and flow back to the NPM if there are no claims made against the account within twenty-five years after each deposit.

8. The Debtor became subject to the Escrow Statutes when it later began its operations. The Debtor currently has approximately $52 million on deposit in escrow accounts.

### The Debtor's Founding and Tax Issues

9. In early 2000, the Wheelers began developing plans to manufacture premium tobacco products on the Yakama Nation. To that end, the Wheelers sought out a highly experienced tobacco blender to create King Mountain's premium blend, and ultimately engaged Jaime Aburto to serve in that capacity. He was with the Debtor since its inception up until September 2019.

10. In establishing King Mountain, the Wheelers faced all the hurdles that make business development on Native American Reservations challenging. Among these challenges, the Wheelers could not use their allotted lands as collateral for start-up capital, so they had to fund all expansion from cash flow generated by their other businesses.

11. In February 2007, the Debtor received its permit to manufacture cigarettes from the Alcohol and Tobacco Tax and Trade Bureau (the "TTB"). The permit was first listed for purposes of the MSA in Washington State in the fall of 2007. Over time the Debtor expanded its sales, and currently sells in 12 states.

12. From the start, however, it was (and remains) difficult for King Mountain to secure distributors. The "Big Tobacco" manufacturers have significant control over

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 4

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11   Doc 5   Filed 09/25/20   Entered 09/25/20 18:32:04   Pg 4 of 11

distribution channels, and generally bar their distributors from carrying lower priced competitors' products.

13. As the Debtor sought to identify available distribution channels, it entered into agreements with individuals that were unable to deliver on promised levels of purchasing. This in turn led to cash flow difficulties in about 2009, which were exacerbated in late 2010 and early 2011 when the Debtor shipped 11 truckloads of product to a distributor in South Carolina for which the Debtor was never paid. This resulted in a loss to King Mountain of nearly $16 million in immediate cash flow. These cash flow issues, combined with advice of counsel and the Debtor's firmly held belief regarding the protections guaranteed in the Yakama Treaty, led to its very first failure to pay federal excise taxes ("FET").

14. In 2011, the Debtor filed a complaint against the United States for injunctive and other relief, arguing that it was not subject to taxation under the General Allotment Act of 1887, 4 Stat. 388, nor the Treaty with the Yakamas of 1855, 12 Stat. 951. The District Court for the Eastern District of Washington ruled in favor of the federal government, upheld the excise taxes imposed by the TTB, and entered a judgment against the Debtor of almost $58 million. The Ninth Circuit Court of Appeals affirmed the judgment, and the United States Supreme Court denied a petition for certiorari in June 2019. As of today, the amount owed totals about $75 million of principal, interest and penalties.

15. Notwithstanding these challenges, King Mountain has remained in operations and remains current on all FET and escrow obligations since April of 2013. King Mountain is approved for sale in 12 states.

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 5

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 5 of 11

16. King Mountain has entered into final settlement agreements with Indiana, South Carolina and the Food and Drug Administration for prior unpaid taxes. King Mountain has also entered an interim repayment plan with the United States Department of Agriculture for outstanding taxes. King Mountain has remained current on all payments per the various settlement agreements. The amount owed related to unpaid FET is the only amount that has not been settled.

17. The Debtor through counsel has been in communication with the Department of Justice to work towards an agreement to settle the outstanding debt associated with unpaid FET. During this process, the Debtor provided documents detailing its financial position to show available cash flow for potential repayments. (For context, the Debtor's gross revenues during 2019 were less than $30 million.)

18. On behalf of the TTB, on August 25, 2020, the Department of the Treasury sent the Debtor a final notice and demand for repayment of the outstanding FET. According to the government's calculation, the amount owed is $75,467,193.24, consisting of $38,330,298.27 of principal, $18,336,086.92 of interest, $9,135,348.90 for failure to file timely and $9,665,459.15 for failure to pay timely. The government threatened to levy against the Debtor' assets if payment was not made within thirty days of the Debtor's receipt of the demand letter.

19. The Debtor is not in a financial position to repay the $75.5 million owed to TTB and a levy of the Debtor's assets would likely result in the cessation of the Debtor's operations and the loss of jobs on the Yakama Nation Reservation. The Debtor therefore made the difficult decision to commence this case, to provide it with

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 6

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 6 of 11

an opportunity to address its outstanding obligations in a manner that allows it to remain in operation going forward.

### Cash Management Motion

20. The Debtor actively uses its Bank Accounts as listed in the Cash Management Motion. The Heritage Bank Business Checking account and Truist Bank Business Checking account are the Debtor's operating accounts used in the ordinary course of business. The Debtor regularly uses the Heritage Bank EFT Account and Wire Account for secure transferring and wiring of funds, respectively. Both the EFT and Wire account maintain a zero balance.

21. The Bank Accounts are an integral part of the Debtor's business operations. Requiring the Debtor to establish new bank accounts would cause delay and disruption, particularly when the Debtor is already subject to the usual operational adjustments attendant to a Chapter 11 filing. Use of existing accounts and checks will ensure that there is a smooth transition into Chapter 11 and minimal disruption of the Debtor's operations.

22. The Debtor also maintains the Escrow Accounts as listed in the Cash Management Motion. As a function of state laws enacted pursuant to the 1998 tobacco Master Settlement Agreement, King Mountain is required to place funds into a qualified escrow account for qualifying sales of cigarettes and roll-your-own tobacco in states that are signatories to the MSA. The unit rate of these deposits has increased over time, and is currently $7.37 per carton of sales within each state.

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 7

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 7 of 11

23. Pursuant to the various state laws, the funds must remain in escrow for 25 years after deposit. This serves as a "reserve fund" to satisfy potential state claims against King Mountain akin to those which prompted the MSA. If there are no state judgments or settlements against King Mountain within the 25-year period, those funds revert to King Mountain on a rolling basis. In the meantime, the funds in the Escrow Accounts are segregated from the Debtor's assets and cannot be used for any purpose other than to satisfy potential state claims.

24. However, as a qualified trust account, the Debtor is permitted to invest the Escrow Funds, subject to restrictions that do not risk the principal amounts in Escrow Accounts. The related income reflects interest and other appreciation on the Debtor's qualified Escrow Accounts. Although the principal funds must be held in escrow to satisfy potential state claims, the Debtor is allowed to invest the escrow funds and earns income on those investments.

## Employee Wage Motion

25. The Debtor has approximately 63 full-time and 3 part-time employees, working in various positions across the Debtor's farming, production, sales, distribution, and administrative operations.

26. The Debtor pays wages and salaries to the Employees on a bi-weekly basis. The Debtor's aggregate gross payroll for all Employees, per payroll period, is approximately $144,160. No employee was owed more than $13,650 for prepetition wages.

27. It is critical to the continuation of the Debtor's operations, and to the Debtor's smooth transition into Chapter 11, that payments to its Employees are made in

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT
OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS –
Page 8

Bush Kornfeld llp
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 8 of 11

a timely manner. The next payroll date is October 1, 2020 for the pay period September 13–26, 2020.

28. In light of the foregoing, the Debtor seeks authority to disburse its Payroll Obligations on the regularly-scheduled payroll date of October 1, 2020, for work performed prior to the Petition Date in accordance with its ordinary prepetition practices. In addition, there may be checks issued to Employees for pay periods ending prior to the Petition Date that have not cleared as of the Petition Date and which the Employees will seek to cash or deposit postpetition. The Debtor seeks authority to permit its bank to honor these checks as well, notwithstanding that they may be presented postpetition for payment.

29. The Debtor maintains employer-sponsored medical, dental, vision, life, and long-term disability insurance plans for its Employees, with monthly costs as indicated in the Employee Wage Motion. The Debtor seeks authority to pay its Benefit Plan Obligations incurred prior to the Petition Date in accordance with its ordinary prepetition practices.

30. In the ordinary course of its business, the Debtor reimburses its Employees for expenses incurred in connection with their employment with the Debtor. The Debtor also directly reimburses third-party credit card providers for certain expenses incurred by the Debtor relating to a variety of business and travel related expenses. The Debtor pays on average approximately $4,000 to $5,000 per month in connection with expenses incurred by the Employees. All such expenses are incurred on the Debtor's behalf in connection with its management and operational obligations and in reliance upon the Debtor's reimbursement policy.

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 9

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 9 of 11

31. The Debtor is required by law to withhold from the Employees' wages amounts related to federal income taxes, and social security and Medicare taxes and to remit the same to the appropriate taxing authorities. The Debtor is required to match from its own funds the social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for unemployment insurance and to remit the Payroll Taxes to the Taxing Authorities. The Debtor estimates that, on a semi-monthly basis, it remits an approximate total of $37,140 including both Employer Payroll Taxes and Tax Withholdings to the Taxing Authorities. The Debtor requests authority to continue to perform these functions on an ongoing and uninterrupted basis.

32. In addition to the Payroll Taxes, the Company may withhold from Employees' wages amounts for repayment of employee advances from the Debtor and amounts pursuant to court orders, under applicable law and, in turn, remit the Wage Deductions to third parties in the ordinary course business.

**Utilities Motion**

33. Prior to the Petition Date, the Utility Providers provided utility services to the Debtor as indicated on Exhibit A to the Utilities Motion. These services are crucial to the Debtor's continued operations and the Debtor may suffer irreparable harm if the relief requested in the Utilities Motion is not granted. The Debtor fully intends to timely pay all postpetition obligations owed to the Utility Providers.

34. As adequate assurance of future payment, the Debtor will establish and fund a Utility Account in the amount of $9,187.01. The Proposed Adequate Assurance is equal to approximately two weeks of service from all of the Debtor's Utility Providers based upon the Debtors' current utility usage in the amounts reflected on

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 10

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 10 of 11

Exhibit A to the Utilities Motion. The Utility Account will serve as a cash security deposit to provide the Utility Providers adequate assurance of payment for utility services provided to the Debtor after the Petition Date.

35. To the extent the Debtor fails to timely pay a Utility Provider for postpetition services, such Utility Provider may submit a payment request to the non-paying Debtor, certifying that such Debtor failed to pay for postpetition services and that such amounts are still outstanding. The Debtor shall pay the outstanding amount within seven business days following receipt of the payment request, subject to the Debtor's right to contest the payment request.

36. Payments from the Utility Account shall be made in the order that the Debtors receive requests and the Debtors shall ensure that the Utility Account is replenished such that it remains at $9,187.01, or such greater amount to which the Debtor may agree or the Court may otherwise require.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing information is true and correct.

SIGNED this 25th day of September, 2020.

        /s/ Truman J. Thompson
        Truman J. Thompson

DECLARATION OF TRUMAN J. THOMPSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS – Page 11

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

di25g701nf

20-01808-WLH11    Doc 5    Filed 09/25/20    Entered 09/25/20 18:32:04    Pg 11 of 11