**So Ordered.**

**Dated: November 23rd, 2020**



Whitman L. Holt
Bankruptcy Judge

*FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Case No. 20-01808-WLH11 |
| KING MOUNTAIN TOBACCO COMPANY, INC., | |
| Debtor. | **MEMORANDUM OPINION** |

The world is an uncertain place where risks abound. Risks an ordinary person might tolerate could be bad bets for a bankrupt business – most debtors in bankruptcy are insolvent and need to maximize their limited estates for creditors. The Bankruptcy Code therefore contains various mechanisms to shelter bankruptcy estates from risks that Congress determined may be unacceptable.

This case involves a dispute about one such mechanism: the rule in Bankruptcy Code section 345(b) creating special requirements for financial institutions at which money of the bankruptcy estate is deposited or invested. The debtor seeks a waiver of these banking requirements, but the local United States trustee (the "UST") contends that the court lacks the power to grant such a waiver and, in any event, that no waiver is warranted. For the reasons detailed below, the court disagrees with the UST's positions.

### BACKGROUND & PROCEDURAL POSTURE

The debtor, a manufacturer of tobacco products, commenced this bankruptcy case due to developments in a long-running dispute with the Alcohol and Tobacco

Tax and Trade Bureau.[1]  As part of its suite of first-day motions, the debtor moved for authority to continue to use its prepetition cash management system, bank accounts, and escrow accounts, as well as for a general waiver of the requirements of Bankruptcy Code section 345(b).

The specific accounts implicated by the debtor's motion are:

- Three operational accounts at Heritage Bank: a business checking account with a petition-date balance of $561,872.48,[2] as well as an EFT account and a wire account each maintained with a $0 balance;[3]

- Another operational account at Truist Bank in the form of a second business checking account with a petition-date balance of $1,017,560.94;[4] and

- A collection of 21 segregated escrow accounts at Truist Bank with an aggregate balance of $51,771,426.71 on the petition date.[5]  Each account corresponds to a particular state in which the debtor's tobacco products are sold and which have laws requiring the funding of "reserve funds" to effectively collateralize potential claims the particular state might assert against the debtor.[6]  The debtor represents that it is permitted to invest the escrowed funds but cannot use the balance of these accounts for any purpose other than to satisfy potential state claims.

The debtor supported its motion with a declaration from its CEO and Corporate Vice President explaining that these accounts are integral to the debtor's business and that establishing new bank accounts would cause delay and disruption.[7]  The motion further argued that the two banks "are reputable,

---

[1] *See generally United States v. King Mountain Tobacco Co.*, 899 F.3d 954 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2691 (2019).

[2] *See* Schedule A/B, ECF No. 1.

[3] *See* Thompson Decl. ¶ 20, ECF No. 5.

[4] *See* Schedule A/B, ECF No. 1.

[5] *See id.*

[6] This is a simplified summary of a complicated arrangement resulting from a 1998 settlement between numerous parties resolving tobacco-related litigation.  The details are not important for present purposes and the court makes no findings or conclusions regarding these accounts or any party's rights and obligations related thereto.

[7] *See* Thompson Decl. ¶¶ 20-24, ECF No. 5.

financially-stable banking institutions" with which the debtor has "long-established and cooperative relationships."[8]

The UST objected to the debtor's request to waive the requirements of Bankruptcy Code section 345(b) regarding the two checking accounts and the escrow accounts, arguing that the statutory requirement is mandatory and "does not have any exceptions written into it" and that the debtor had not justified a deviation in this case.[9] The parties agreed to continue the matter to explore whether the UST's objections could be resolved; the court entered an interim order to facilitate those efforts.[10] Unfortunately, negotiations resulted in an impasse, leaving a dispute for the court's resolution. The matter is now ready for decision.

## DISCUSSION

### *Jurisdiction & Power*

The court has subject matter jurisdiction regarding this bankruptcy case and the debtor's motion pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' dispute regarding the application of Bankruptcy Code section 345 is statutorily "core" and "the action at issue stems from the bankruptcy itself."[11] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

### *Bankruptcy Code Section 345(b)*

#### I. Operation of the Statute Generally

The commencement of a bankruptcy case creates a new entity – the estate – comprised of most of a debtor's property.[12] A trustee is often appointed as a fiduciary to administer the estate in accordance with the Bankruptcy Code, although in a chapter 11 case such as this one, the debtor in possession generally

---

[8] *See* Emergency Mot. for Continued Use of Prepet. Cash Mgmt. Sys., Bank Accounts, and Escrow Accounts at pp. 8-9, ECF No. 3.

[9] *See* Obj. to Mot. to Waive Section 345(b) of Title 11 ¶ 5, ECF No. 14.

[10] Interim Order Authorizing Debtor to Continue Use of Prepet. Cash Mgmt. Sys., Bank Accounts, and Escrow Accounts, ECF No. 25.

[11] *See* 28 U.S.C. § 157(b)(2)(A); *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

[12] *See* 11 U.S.C. § 541.

has the rights, powers, and duties of a trustee, including regarding administration of the estate and preserving estate property as a fiduciary for creditors.[13]

One category of property common to almost every debtor, to a greater or lesser extent, is money.[14] The Bankruptcy Code accordingly has specific provisions regarding money that becomes estate property. Among these, 11 U.S.C. § 345(a) broadly authorizes a trustee to "make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment," which essentially comports with the "prudent investor" standard applicable under various nonbankruptcy laws.[15] Section 345(b) limits the reach of section 345(a) by detailing specific requirements regarding counterparties to a bankruptcy trustee's deposit or investment transactions:

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested—
>
> (1) a bond—
>
> (A) in favor of the United States;

---

[13] *See id.* § 1107(a); *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 124 (2015) ("As in many Chapter 11 bankruptcies, no trustee was appointed and ASARCO—the 'debtor in possession'—administered the bankruptcy estate as a fiduciary for the estate's creditors."); *Wolf v. Weinstein*, 372 U.S. 633, 649 (1963) ("But so long as the Debtor remains in possession, it is clear that the *corporation* bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession.").

[14] The court uses the concept of "money" in the colloquial sense. Although money can take the form of physical currency, such as coins or bills, the more prevalent form of money is account balances at depository institutions – i.e., book entries reflecting a given amount of currency to which the depository institution is liable to the depositor, typically on demand. *See generally* John J. Chung, *Money as Simulacrum: The Legal Nature and Reality of Money*, 5 HASTINGS BUS. L.J. 109 (2009); Joseph H. Sommer, *Where Is a Bank Account?*, 57 MD. L. REV. 1 (1998). The bankruptcy estate generally acquires the same rights in a debtor's deposit accounts as the debtor had, including remaining subject to claims, defenses, and other limitations that the depository institution might interpose against the debtor outside of bankruptcy. *See, e.g.*, *Bank of Marin v. England*, 385 U.S. 99, 101-02 (1966) (Douglas, J.).

[15] *See, e.g.*, *Knight v. Comm'r*, 552 U.S. 181, 193 (2008).

>> (B) secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and
>> (C) conditioned on—
>>> (i) a proper accounting for all money so deposited or invested and for any return on such money;
>>> (ii) prompt repayment of such money and return; and
>>> (iii) faithful performance of duties as a depository; or
>
> (2) the deposit of securities of the kind specified in section 9303 of title 31;
>
> ***unless the court for cause orders otherwise.***[16]

Section 345(b) accounts for the reality that banks fail and that full recovery of deposited funds is unlikely in this unfortunate event. An ordinary deposit account simply creates an unsecured promise to pay that a depositor may assert against the bank.[17] As previewed by the initial clause of section 345(b), insurance provided as a result of Federal Deposit Insurance Act protects depositors against loss, but such insurance is capped leaving balances exceeding the cap at risk.[18] When the depositor is a bankruptcy estate, creditors are often the residual claimants of the accounts and thus the parties bearing the ultimate risk of loss – despite their typical lack of control over how the funds are held. Section 345(b) is

---

[16] 11 U.S.C. § 345(b) (emphasis added). Publications presenting the statutory text are inconsistent regarding placement of the emphasized clause. On one hand, the clause is set off from (b)(2) through a carriage return, left margin indentation, or both by the Government Publishing Office's PDF version of the statute, Westlaw, the *Mini Code* published by AWHFY, L.P., Thomson Reuters' *Bankruptcy Code, Rules and Forms*, the *Norton Bankruptcy Code*, the *Collier on Bankruptcy* treatise, and the Cornell Law School's Legal Information Institute website. On the other hand, the clause is included as part of the same line of text as (b)(2) by LexisNexis, the *Collier Portable Pamphlet*, and the *United States Code Service* (Lawyers Edition). As discussed below, the court's interpretation of the text is based on its grammar, punctation, and overall structure, not its visual presentation. Hence, the reproduction here reflects no view about the accuracy of the placement of the emphasized text but is simply for ease of reference.

[17] *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995).

[18] *See* 12 U.S.C. § 1821(a). Title 12 contains other protections for depositors, including so-called "depositor preference" provisions creating a priority claim for "[a]ny deposit liability of the institution" in an FDIC receivership proceeding. *See id.* § 1821(d)(11)(A)(ii). Much like the priorities created by Bankruptcy Code section 507(a), however, depositor preference priority may prove ephemeral if the receivership assets are insufficient to satisfy all senior claims or all equal-priority claims in full.

designed to reduce this risk to creditors by converting the funds' status from an unsecured claim into one better protected by either a bond or deposit of permitted securities.[19]

To effect the protective measures contained in section 345(b), the UST approves banking institutions in which to deposit estate funds and provides Uniform Depository agreements. This role is consistent with the UST's general supervisory duties imposed by 28 U.S.C. § 586(a)(3) and its specific approval role under Bankruptcy Code section 345(b)(1)(B). The UST has approved neither Heritage Bank nor Truist Bank for the deposit of estate funds in this district. And the banks are apparently unable to make other arrangements that satisfy section 345(b) for the debtor's case. As such, compliance with section 345(b) requires the debtor to move its operational and escrow accounts to other banks.

## II. Operation of the "Orders Otherwise Clause"

As one of various amendments made by the Bankruptcy Reform Act of 1994, Congress added the final clause of section 345(b): "unless the court for cause orders otherwise" (the "Orders Otherwise Clause"). The debtor and the UST disagree about the operation of this clause. The debtor contends that the clause allows the court to alter the requirements of section 345(b)(1), (b)(2), or both. The UST, on the other hand, asserts that the clause allows the court to modify the requirements of (b)(2) alone. Therefore, the UST contends, the court lacks power to modify the requirements of (b)(1). For the reasons set forth below, the court concludes that the debtor's construction of the statute is the correct one.

When working with the Bankruptcy Code, one must always start with the text.[20] Textual interpretation involves consideration of the grammar and

---

[19] The need to manage banking risks associated with bankruptcy estate money has long been recognized. For example, in *State Nat'l Bank of Springfield v. Dodge*, 124 U.S. 333 (1888), the Supreme Court considered whether a bank should be held liable for a failure to keep separate accounts for multiple bankruptcy estates or for the subsequent insufficiency of funds deposited in a consolidated account (spoiler alert: the bank won).

[20] *See, e.g.*, *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019).

**MEMORANDUM OPINION**        Page 6

punctuation used in the statute.[21]  Indeed, seemingly minor uses of punctuation can sometimes be an outcome-determinative feature of a statute.[22]

Applying principles of statutory interpretation to the provision at issue here, the court first notes that section 345(b) is a single, 151-word sentence.  The sentence begins with a lengthy exception clause, sets forth a declarative mandate ("the trustee shall require from an entity with which such money is deposited or invested"), provides disjunctive alternatives for satisfying the mandate (the very lengthy (b)(1) with multiple subparts and the more compact (b)(2)) separated by a semicolon, and concludes with the Orders Otherwise Clause set off by another semicolon.  The grammar and punctuation of the sentence demonstrate that the Orders Otherwise Clause applies to the entirety of the preceding text, both (b)(1) and (b)(2).  If the drafters intended the Orders Otherwise Clause to operate only regarding (b)(2), then it should be included as part of the same clause and separated by a comma.  The semicolon that appears in the statute is stronger punctuation establishing a separation or distinction between (b)(2) and the Orders Otherwise Clause.[23]  The grammatical consequence of that separation is that the Orders Otherwise Clause modifies all the preceding text starting with the declarative mandate as its predicate, including both (b)(1) and (b)(2).

Independent of grammar and punctuation, logic dictates that the Orders Otherwise Clause effectively reaches both (b)(1) and (b)(2).  Recall that section 345(b) includes a mandate that can be satisfied by one of two disjunctive alternatives: either as described in (b)(1) *or* as described in (b)(2).  Thus, the trustee has the option of forgoing the requirements of (b)(1) by satisfying those contained in (b)(2).  Even if we limited the Orders Otherwise Clause to (b)(2) for the sake of argument, the disjunctive nature of section 345(b) produces the same ultimate result as if the Orders Otherwise Clause was not so limited (because the as-modified option under (b)(2) could be used to satisfy the statutory requirement

---

[21] *See, e.g.*, *United States Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("Statutory construction is a holistic endeavor and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." (cleaned up)); *United States v. Trent*, 654 F.3d 574, 582 (6th Cir. 2011) ("Grammatical structure cannot be ignored in the endeavor of statutory construction."); A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 23, p. 161 (2012) (describing the Punctuation Canon and discussing how punctuation in legal texts "will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part").

[22] *See, e.g.*, *United States v. Ron Pair Enters.*, 489 U.S. 235, 241-42 (1989); *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 75-76 (1st Cir. 2017).

[23] *See, e.g.*, *McLeod v. Nagle*, 48 F.2d 189, 191 (9th Cir. 1931); *IntelliCAD Tech. Consortium v. Suzhou Gstarsoft Co.*, 2020 U.S. Dist. LEXIS 100012, at *19-20 (D. Or. June 8, 2020); *United States v. Florida*, 870 F. Supp. 2d 1346, 1349 (N.D. Fla. 2012).

**MEMORANDUM OPINION**          Page 7

as an alternative to the hypothetically-unmodifiable (b)(1)). Thus, even if the drafters for some reason intended otherwise, any attempt to limit the reach of the Orders Otherwise Clause to section 345(b)(2) proves futile.

Although the plain meaning flowing from section 345(b)'s language, punctuation, and structure is dispositive, a review of the provision's evolution underscores the court's conclusion. The 1994 amendments made only one change to section 345 by adding the Orders Otherwise Clause – otherwise, the pre- and post-amendment versions are identical. Reviewing the earlier version in *United States Trustee v. Columbia Gas Systems*, the Court of Appeals for the Third Circuit addressed a question similar to that posed here: whether estate funds can be invested in ways other than those detailed in section 345(b).[24] Also based on "clear statutory language," the court answered with an unequivocal "no" as the statute at that time provided no alternative to the options set forth in (b)(1) or (b)(2).[25] Just months later, Congress amended section 345(b) to add the Orders Otherwise Clause. The following legislative history explained the addition:

> Section 345 of the Code governs investments of the funds of bankruptcy estates. The purpose is to make sure that the funds of a bankrupt that are obligated to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors. ***This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause,*** thereby overruling *In re Columbia Gas Systems, Inc.*, 1994 WL 46314 (3d Cir. Del).[26]

This commentary reveals no intent to limit the Orders Otherwise Clause but refers to section 345(b) as a whole, necessarily incorporating both (b)(1) and (b)(2). This legislative statement is entirely consistent with the plain meaning of the statutory text and dispels any reservation one might have about the drafters' intent.

---

[24] *United States Trustee v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 33 F.3d 294 (3d Cir. 1994).

[25] *Id*. at 303.

[26] H.R. Rep. No. 103-835, at 46-47 (1994) (emphasis added).

Other courts and commentators have also concluded, albeit with little discussion, that the Orders Otherwise Clause applies to all of section 345(b).[27] The court has found nothing suggesting a limitation on the clause as the UST asserts. In fact, as the debtor notes, a national manual for the United States Trustee Program appears to construe the statute in a manner consistent with the court's and the debtor's understanding.[28] Although the UST disputes the debtor's reading of that manual, the UST cites no authority supporting its limiting interpretation of section 345(b).

In sum, standard tools of statutory construction and all other indicators point the same direction – the Orders Otherwise Clause of section 345(b) encompasses the entirety of that section and thus permits the court to alter or eliminate the requirements that would otherwise exist under (b)(1), or (b)(2), or both.

### III. Application of the Orders Otherwise Clause

With the scope of the Orders Otherwise Clause clarified, the court now explores its application. The plain text allows the court to order otherwise "for cause," but nothing in section 345(b) suggests what constitutes sufficient cause. As a result, and as with other parts of the Bankruptcy Code containing a "cause" concept, the court must undertake a holistic, context-driven analysis of a particular case's facts and circumstances.[29]

---

[27] *See, e.g.*, *In re Seger*, 444 B.R. 492, 493 (Bankr. D. Mass. 2011) (observing how "§ 345(b) allows the court for cause to waive the requirements of the section"); *In re Service Merchandise Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) ("The 1994 amendments to the United States Bankruptcy Code added the final phrase of § 345(b)(2) to provide that the court may 'for cause' excuse performance by the debtor under this section."); 3 COLLIER ON BANKRUPTCY ¶ 345.04 (16th ed. rev. 2020) ("The Bankruptcy Reform Act of 1994 overruled *Columbia Gas* by providing explicit authority for bankruptcy courts to modify or waive the stringent requirements of section 345(b).").

[28] *See United States Trustee Program Policy and Practices Manual*, Vol. 7, § 1.3, *available at* https://www.justice.gov/ust/united-states-trustee-program-policy-and-practices-manual (explaining that "[a]ll depositories are required to maintain collateral, ***unless an order of the bankruptcy court provides otherwise,*** in an amount no less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit by" one of the two options in section 345(b)(1) and (b)(2) (emphasis added)).

[29] *See, e.g.*, *In re Ditech Holding Corp.*, 605 B.R. 10, 20 (Bankr. S.D.N.Y. 2019) ("In determining whether there is 'cause' to waive the account collateralization requirements under section 345(b), the Court will apply a totality of the circumstances test . . . ."); *In re Service Merchandise Co.*, 240 B.R. at 896 (adopting "a totality of circumstances inquiry"); 3 COLLIER ON BANKRUPTCY ¶ 345.04 (16th ed. rev. 2020) (explaining how courts "consider the totality of the circumstances in determining whether cause exists"). *Accord In re Zamora*, 2020 Bankr. LEXIS 1963, at *13-14 (Bankr. E.D. Wash. July 27, 2020) (discussing the "holistic assessment of the unique aspects of a particular case" that determines whether "cause" exists to dismiss or convert a bankruptcy case).

Bankruptcy Judge George C. Paine, II adopted such a comprehensive approach in perhaps the most notable opinion addressing the reach of the Orders Otherwise Clause. In doing so, Judge Paine fleshed out the following factors bearing on what might constitute sufficient cause under section 345(b):

1. The sophistication of the debtor's business;

2. The size of the debtor's business operations;

3. The amount of investments involved;

4. The bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor-in-possession funds are held;

5. The complexity of the case;

6. The safeguards in place within the debtor's own business of insuring the safety of the funds;

7. The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

8. The benefit to the debtor;

9. The harm, if any, to the estate; and

10. The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.[30]

While nonbinding, the court finds this framework useful. As with many multi-factor legal tests, this list is not exhaustive and any individual factor or combination of factors will not control. Moreover, a given case may implicate additional or different considerations.[31] The inquiry ultimately is a fact- and

---

[30] *In re Service Merchandise Co.*, 240 B.R. at 896.

[31] *See, e.g.*, *In re Ditech Holding Corp.*, 605 B.R. at 20 (describing the court's "cause" approach as being "like the one used by the court in *Service Merchandise*, although it will not be bound by the factors considered by that court").

context-specific assessment of the appropriate result under the totality of the circumstances presented.

## FINDINGS & CONCLUSIONS

Based on the several considerations discussed below, the court concludes that cause exists to allow this particular chapter 11 debtor to continue using its existing cash management systems and accounts.

At the outset, several of the *Service Merchandise* factors weigh in favor of the debtor. Immediately noteworthy are those related to the size and sophistication of the debtor's business operations (factors 1 and 2). These attributes are evident from, among other things, the large amounts of money flowing through the business on a regular basis, all in a highly competitive and highly regulated industry requiring compliance with an array of federal and several states' laws. The debtor's ability to manage and maintain its operations reveals careful internal controls adequate to mitigate risk (factor 6). Moreover, while the debtor does not specifically discuss the banks' ratings, there is no dispute that both Heritage Bank and Truist Bank are sizeable and appear to be sufficiently stable banking institutions (factor 4). Additional *Service Merchandise* factors are intertwined with other considerations as noted below.

A second set of considerations involve factors unique to the prosecution of this particular bankruptcy case. These include:

- The debtor filed this bankruptcy case not to address operational concerns or to access a broad array of bankruptcy tools, but to use bankruptcy as a vehicle to resolve a longstanding dispute with the Alcohol and Tobacco Tax and Trade Bureau.

- Although bankruptcy cases can take unexpected turns and have surprise endings, this case seems unlikely to result in a liquidation or the use of cash on hand as the primary form of plan consideration. The protections for the estate in section 345(b) have the most utility in a liquidating case where assets are reduced to money, which accumulates over an extended period of time to fund eventual creditor distributions. This creates significant risk to creditors between the time of liquidation and the time

of distribution.[32] The utility of section 345(b) diminishes in the context of a bankruptcy case, such as this one, where reorganization seems likely and the business will continue as a going concern.

- Further amplifying the preceding point, the debtor's cash on hand is generally used to fund operational disbursements, which generate new cash receipts (or accounts receivable) in what appears to be a generally profitable business operation.[33] Cash management thus is intimately connected with the debtor's overall business operations. Absent credible allegations of mismanagement (which has not been suggested here), the court is reluctant to usurp the ability of an operating chapter 11 debtor's management to make reasonable business judgments and decisions about operational issues during the pendency of the chapter 11 case. Here, the debtor's management appears to have made a reasonable business decision that the benefits of maintaining banking relationships and harmony with prepetition operational practices outweigh the potential risks of Heritage Bank or Truist Bank (or both) failing and, therefore, that sticking with the status quo is the path most likely to maximize the value of the debtor's business (and hence the bankruptcy estate).

- Amplifying the same point even more is the fact that the debtor appears to intend to progress quickly through the bankruptcy process. The debtor has agreed with the UST to file a plan and disclosure statement by December 31, 2020,[34] and debtor's counsel has represented on the record that a plan might even be filed during November 2020. Such an abbreviated stay in bankruptcy reduces the risk to the debtor's bank accounts during the pendency of the case, which means that the debtor's articulated intent to proceed quickly further supports its requested waiver.

- Finally, the failure of one or both of the relevant banking institutions is unlikely to be fatal to the debtor's reorganization efforts (*Service Merchandise* factor 7). As noted above, the debtor's operations appear

---

[32] The paradigmatic example of this is a chapter 7 liquidation in which the trustee liquidates estate assets and pursues avoidance actions over a period of months or years, thereby accumulating money that needs investing and protecting during the pendency of the case before the trustee is ready to submit a final report and distribute the accumulated estate *res* to creditors. Some chapter 11 cases operate in a similar fashion – national examples of such cases include the Lehman Brothers, Washington Mutual, and Enron bankruptcies, whereas a more localized example of such a case includes 47 Hops LLC.

[33] *See* Cash Collateral Budget Ex. A, ECF No. 112.

[34] *See* Agreed Scheduling Order ¶ 5, ECF No. 34.

generally profitable and yield positive cash inflows most months. If a banking failure prevented the debtor from accessing some portion of its business checking accounts, it seems likely that the debtor could secure some sort of short-term bridge loan or other financing to plug the temporary operational hole. Although such an event would be disruptive and stressful, it seems unlikely to destroy the prospect of a successful reorganization.

A third factor that warrants independent consideration relates to the several segregated escrow accounts at Truist Bank. The court is mindful of the complexity associated with those accounts and the likely involvement of various actors throughout each of the more than twenty applicable state governments. Requiring these accounts to effectively be dissembled and then rebuilt at other banking institutions would undoubtedly necessitate the involvement of undue resources, necessarily inhibiting reorganization efforts. Such a reallocation of resources would harm the estate (*Service Merchandise* factor 9). Since these escrow accounts may end up being largely or totally unaffected by the bankruptcy case, the court is reluctant to allow section 345(b) to become a tail wagging the dog of these complex and established arrangements. Obviating such issues benefits the debtor (*Service Merchandise* factor 8). Avoiding the significant externalities (including what would likely be material professional fees charged to the debtor's estate) associated with recalibrating the details of all these escrow accounts is, by itself, sufficient cause for a waiver of section 345(b) as it relates to those accounts.

Finally, none of the estate's economic stakeholders, including the Alcohol and Tobacco Tax and Trade Bureau or any of the states involved with the escrow accounts, opposed the debtor's motion or joined the UST's objection. Although the court certainly appreciates the UST's broad responsibilities and generalized standing as a "watchdog" of the bankruptcy system and the UST's unique role in administering section 345(b), the silence of sophisticated parties who bear the disproportionate risk of loss warrants consideration. The lack of resistance to the debtor's requests indicates the stakeholders' support for, or at least acquiescence in, maintaining the status quo regarding the accounts.

Taken collectively, the foregoing considerations suffice to establish "cause" for the court to order otherwise, thereby waiving the need for the debtor to rearrange its banking affairs to satisfy section 345(b).

## SUMMATION

The court concludes that Bankruptcy Code section 345(b) provides specific statutory authority for the court to waive any requirement imposed thereunder if cause exists. And the totality of the circumstances presented in this particular case establish cause for the court to order otherwise. The debtor's counsel should circulate a proposed form of final order to counsel for the UST and thereafter upload an order for the court's review and signature.