JAMES L. DAY (WSBA #20474)
RICHARD B. KEETON (WSBA #51537)
BUSH KORNFELD LLP
601 UNION STREET, SUITE 5000
SEATTLE, WA 98101
Tel: (206) 292-2110
Email: jday@bskd.com
Email: rkeeton@bskd.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

In re

KING MOUNTAIN TOBACCO
COMPANY, INC.,

     Debtor.

No. 20-01808

DISCLOSURE STATEMENT
FOR DEBTOR'S PLAN OF
REORGANIZATION

**IMPORTANT:** THIS DISCLOSURE STATEMENT CONTAINS INFORMATION
RELATED TO THE PROPOSED PLAN OF REORGANIZATION WITH RESPECT
TO KING MOUNTAIN TOBACCO COMPANY, INC. (THE "DEBTOR"):

  PLEASE READ THIS DOCUMENT WITH CARE. THIS DOCUMENT
SUMMARIZES THE TERMS OF THE DEBTOR'S PROPOSED PLAN OF
REORGANIZATION. THE DEBTOR MAY CONTINUE TO NEGOTIATE
PAYMENT TERMS WITH ITS CREDITORS, AND THE SPECIFIC TREATMENT
OF CLAIMS MAY CHANGE AS A RESULT, BUT THE DEBTOR BELIEVES
THAT THE PAYMENT TERMS WHICH THE DEBTOR WILL ASK THE COURT
TO APPROVE WILL NOT BE LESS FAVORABLE THAN THOSE DESCRIBED
HEREIN.

  TO ALL PARTIES IN INTEREST:

  On September 25, 2020 (the "Petition Date"), the Debtor filed its petition for
relief under Chapter 11 of the Bankruptcy Code. The Debtor is presently acting as a
debtor in possession. The Debtor's reorganization case is pending before the above-
captioned court.

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

This Disclosure Statement is submitted by the Debtor and contains information with respect to Debtor's proposed Plan of Reorganization (the "Plan"). Pursuant to § 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you along with a copy of the proposed Plan to allow you to make an informed decision in exercising your right to accept or reject the proposed Plan. This Disclosure Statement has been approved by order of the court pursuant to § 1125 of the Bankruptcy Code as containing information of a kind, and in sufficient detail, as far as is reasonably practicable under the circumstances, that would enable a hypothetical reasonable investor to make an informed judgment about the Plan. In the event of inconsistencies between the Plan and the Disclosure Statement, however, the terms of the Plan shall control. The court's approval of this Disclosure Statement does not constitute an endorsement of the proposed Plan by the court.

THE ONLY REPRESENTATIONS THAT ARE AUTHORIZED OR THAT MAY BE MADE CONCERNING THE DEBTOR, THE VALUE OF ASSETS, OR THE PLAN ARE CONTAINED IN THIS DISCLOSURE STATEMENT. THE FINANCIAL INFORMATION CONTAINED HEREIN OR INCORPORATED BY REFERENCE HAS BEEN PREPARED BY THE DEBTOR'S MANAGEMENT AND IS EFFECTIVE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE READER SHOULD NOT INFER OR ASSUME THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. FINANCIAL INFORMATION, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE AND PRUDENT BY MANAGEMENT, MAY NOT BE REALIZED AND WILL REMAIN SUBJECT TO INHERENT UNCERTAINTIES. THE FINANCIAL INFORMATION HAS NOT BEEN SUBJECTED TO AN AUDIT AND FOR THAT REASON THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY. HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY REPRESENTED.

The Debtor urges you to accept the proposed Plan and to promptly return your completed ballot to enable your vote to be counted. The Plan provides for payment to creditors from the proceeds of its Qualified Escrow Accounts, as described herein, and from amounts generated from the Debtor's business operations, which, in the Debtor's opinion, provides greater recovery than which is likely under a liquidation of King

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

Mountain Tobacco Company.  Accordingly, the Debtor believes that approval of the Plan is in the best interests of all creditors.

# ARTICLE I.
# DEFINITIONS

Terms used in this Disclosure Statement not specifically defined herein or in the Bankruptcy Code shall be defined as set forth in the Plan that accompanies this Disclosure Statement.  In particular, certain capitalized terms shall have the meanings ascribed for such terms in Section II of the Plan.

# ARTICLE II.
# BACKGROUND INFORMATION

## A.    Historical Background and Events Leading to Bankruptcy

### 1.    The Debtor's Operations and Community Impact

King Mountain Tobacco Company Inc. is a Native American owned and operated tobacco manufacturer based in White Swan, Washington, within the boundaries of the Yakama Nation Reservation.  The Debtor was founded by Delbert and Trina Wheeler and incorporated in November 2005 under the laws of the Yakama Nation, and registered as a foreign corporation with the State of Washington.

The Yakama Nation Reservation has a low per capita income and high poverty rate.  King Mountain is a significant employer on the reservation and provides full-time employment for more than 50 individuals.

The Yakama Nation has over 11,000 members.  Those who choose to stay on the reservation face a host of economic and social challenges.  Poverty, isolation, drug and alcohol abuse, lack of adequate resources to treat mental health issues, family problems and a youth suicide rate 2.5 times greater than the rate among other populations are but a sample of the problems facing the Yakama Nation today.  King Mountain has paid over $10 million in directly to the Yakama Nation taxes over the past 10 years, which has been used to assist the community in a variety of ways.

### 2.    The Master Settlement Agreement and Escrow Accounts

In November 1998, 46 states, five territories, and the District of Columbia (collectively, the "Settling States") agreed with certain major tobacco product

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

manufactures to end years of litigation over tobacco-related illnesses by signing a Master Settlement Agreement (the "MSA"). The remaining four states (Texas, Florida, Minnesota and Mississippi) had previously settled litigation against the major tobacco companies. Under the MSA, the Settling States agreed to dismiss their pending lawsuits (or to refrain from filing suit) against the participating manufacturers ("PMs"), and the PMs agreed to restrict their advertising and marketing practices and make payments to participating states each year in perpetuity.

However, not all tobacco product manufacturers are parties to the MSA (referred to as Non-Participating Manufacturers or "NPMs"), which would have given the NPMs a competitive advantage over PMs. Therefore, the MSA provided incentives for Settling States to pass statutes (the "Escrow Statutes") applicable to NPMs, which generally require NPMs to deposit into an escrow account a specified sum per tobacco unit sold in a state on an annual or quarterly basis. The deposits approximate what the NPMs would pay had they participated in the MSA. The Escrow Statutes also require that NPMs file an annual certification regarding the NPM's compliance with the Escrow Statute and, among other things, a certification that the NPM maintains an escrow account and that the NPM has placed the full amount of the escrow deposit for the preceding year into the escrow account.

To comply with the Escrow Statues, NPMs typically create a master account with a sub-account for each Settling State, and make periodic deposits into the accounts equal to the per-unit charge times the number of units sold within the state. An NPM is generally only allowed to withdraw funds from the escrow accounts to pay a judgment or settlement, or to get a distribution of any income made on the investment of funds in the escrow accounts. The funds deposited roll out of the account and flow back to the NPM if there are no claims made against the account within twenty-five years after each deposit.

The Debtor became subject to the Escrow Statutes when it later began its operations, discussed below. The Debtor currently has approximately $52 million on deposit in Qualified Escrow Accounts in order to comply with the Escrow Statutes enacted by the states in which the Debtor sells its tobacco products.

### 3. The Debtor's Founding and Tax Issues

In early 2000, the Wheelers began developing plans to manufacture premium tobacco products on the Yakama Nation. To that end, the Wheelers sought out a highly experienced tobacco blender to create King Mountain's premium blend, and ultimately

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

engaged Jaime Aburto to serve in that capacity. He was with the Debtor since its inception up until September 2019.

In establishing King Mountain, the Wheelers faced all the hurdles that make business development on Native American Reservations challenging. Among these challenges, the Wheelers could not use their allotted lands as collateral for start-up capital, so they had to fund all expansion from cash flow generated by their other businesses.

In February 2007, the Debtor received its permit to manufacture cigarettes from the Alcohol and Tobacco Tax and Trade Bureau (the "TTB"). The permit was first listed for purposes of the MSA in Washington State in the fall of 2007. Over time the Debtor expanded its sales, and currently sells in 12 states.

From the start, however, it was (and remains) difficult for King Mountain to secure distributors. The "Big Tobacco" manufacturers have significant control over distribution channels, and generally bar their distributors from carrying lower priced competitors' products.

As the Debtor sought to identify available distribution channels, it entered into agreements with individuals that were unable to deliver on promised levels of purchasing. This in turn led to cash flow difficulties in about 2009, which were exacerbated in late 2010 and early 2011 when the Debtor shipped 11 truckloads of product to a distributor in South Carolina for which the Debtor was never paid. This resulted in a loss to King Mountain of nearly $16 million in immediate cash flow. These cash flow issues, combined with advice of counsel and the Debtor's firmly held belief regarding the protections guaranteed in the Yakama Treaty, led to its very first failure to pay federal excise taxes ("FET").

In 2011, the Debtor filed a complaint against the United States for injunctive and other relief, arguing that it was not subject to taxation under the General Allotment Act of 1887, 4 Stat. 388, nor the Treaty with the Yakamas of 1855, 12 Stat. 951. The District Court for the Eastern District of Washington ruled in favor of the federal government, upheld the excise taxes imposed by the TTB, and entered a judgment against the Debtor of almost $58 million. The Ninth Circuit Court of Appeals affirmed the judgment, and the United States Supreme Court denied a petition for certiorari in June 2019. As of today, the amount owed totals about $75 million of principal, interest and penalties.

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

Notwithstanding these challenges, King Mountain has remained in operations and remains current on all FET and escrow obligations since April of 2013. King Mountain is approved for sale in 12 states. King Mountain has entered into final settlement agreements with Indiana, South Carolina and the Food and Drug Administration for prior unpaid taxes. King Mountain has also entered an interim repayment plan with the United States Department of Agriculture for outstanding taxes. Up to the Petition Date, King Mountain had remained current on all payments per the various settlement agreements.

The Debtor, through counsel, has been in communication with the Department of Justice to work towards an agreement to settle the outstanding debt associated with unpaid FET. During this process, the Debtor provided documents detailing its financial position to show available cash flow for potential repayments. Notwithstanding, in August 2020, the Department of the Treasury sent the Debtor a final notice and demand for repayment of the outstanding FET. According to the government's calculation, the amount owed is $75,386,614.25, consisting of approximately $38,316,481.34 in principal, $18,340,409.86 in interest, and $18,729,723.05 in penalties. The government threatened to levy against the Debtor' assets if payment was not made within thirty days of the Debtor's receipt of the demand letter.

The Debtor is not in a financial position to repay the approximately $75 million owed to TTB, and a levy of the Debtor's assets would likely result in the cessation of the Debtor's operations and the loss of jobs on the Yakama Nation Reservation. The Debtor therefore made the difficult decision to commence this case, to provide it with an opportunity to address its outstanding obligations in a manner that allows it to remain in operation going forward.

**B.    Significant Post-Petition Activity in the Bankruptcy Case**

**1.    Debtor-in-Possession.** The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed to serve in this reorganization case.

**2.    No Appointment of Committee.** On October 23, 2020, the US Trustee filed a notice that, despite efforts to contact eligible unsecured creditors, the US Trustee had not received a sufficient number of creditors willing to serve on a committee, and accordingly, the US Trustee is unable to appoint a committee pursuant to 11 U.S.C. § 1102(a). ECF No. 68.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

**3. Orders on Wages and Utilities.** On October 1, 2020, the court entered an order authorizing the Debtor's payment of prepetition payroll, employee benefits, and related expenses. ECF No. 26. Also on October 1, 2020, the court entered interim orders approving the Debtor's proposed adequate protection to utility providers (the "Utility Order"). ECF Nos. 24. After notice to Utility Providers and receiving no responses, the Utility Order became final on October 27, 2020.

**4. Employment of Professionals.** The Court entered orders authorizing the employment of the following professionals pursuant to Bankruptcy Code § 327.

| Professional | Role | Order Entered | Docket No. |
|---|---|---|---|
| Bush Kornfeld LLP | Primary Bankruptcy Counsel to Debtor | 10/30/2020 | 102 |
| Northen Blue, LLP | Advisory Bankruptcy Counsel to Debtor | 10/30/2020 | 103 |
| Troutman Pepper Hamilton Sanders LLP | Regulatory Compliance Counsel to Debtor | 10/30/2020 | 104 |
| Baker & Hostetler LLP | Litigation Special Counsel to Debtor | 10/30/2020 | 105 |
| Petrillo Klein & Boxer LLP | Litigation Special Counsel to Debtor | 10/30/2020 | 106 |
| Bell & Bridges, CPAs | Tax Preparer for Debtor | 10/30/2020 | 107 |

**5. Approval of the Debtor's Continued Use of Prepetition Cash Management System and Escrow Accounts.** The US Trustee objected to the Debtor's continued use of existing bank accounts and escrow accounts primarily on the bases that the Debtor's business checking accounts are not managed by banks included on the US Trustee's list of Authorized Depositories in Eastern Washington, have not posted bonds or other securities in favor of the United States, and therefore do not meet the protection requirements of Code section 345(b). *See* ECF No. 14. Following an initial hearing on October 1, 2020, the matter was continued to allow the parties to resolve the US Trustee's objections, and the court entered an interim order to facilitate those efforts. ECF No. 25. After the continued hearing on November 2, 2020, the court issued a second interim order and took the matter under advisement. ECF No. 120. The court issued a memorandum opinion concluding that the statute provides specific authority for the court to waive the requirements imposed under 345(b), and finding cause in this case to waive the requirements. ECF No. 127. On November 30,

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 7

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

20-01808-WLH11   Doc 155   Filed 12/31/20   Entered 12/31/20 14:06:27   Pg 7 of 29

2020, the court granted the Debtor's motion and authorized it to continue using its existing Cash Management System, including its prepetition Bank Accounts, checks, and Escrow Accounts, and waiving the requirements of Code section 345(b).

**6.    Approval of Debtor's Use of Cash Collateral.**  One day prior to the Petition Date, on September 24, 2020, the TTB filed a UCC Financing Statement and Notice of Federal Tax Lien with the State of Washington Department of Licensing. The Federal Tax Lien, if properly perfected, constitutes a prepetition lien in favor of the United States "upon all property and rights to property, whether real or personal," belonging to the Debtor, pursuant to 26 U.S.C. § 6321.  King Mountain did not receive notice of the Notice of Federal Tax Lien until October 15, 2020, almost three weeks after this case was filed.  Upon receiving notice of the UCC filing and confirmation of the same from the Secretary of State, the Debtor promptly moved the court for an order authorizing use of cash collateral and granting adequate protection. *See* ECF No. 88.

On November 2, 2020, the court entered an order authorizing the Debtor's interim use of cash collateral, and authorized the Debtor to provide adequate protection to the TTB.  ECF No. 112.  After a final hearing, on December 10, 2020, the Court entered a final order authorizing the Debtor's use of cash collateral pursuant to an approved Budget, and authorizing the Debtor to grant adequate protection in favor of the TTB in the form of post-petition replacement liens.  ECF No. 144.

**7.    FIRST Insurance Funding.**  In the ordinary course of the Debtor's business, the Debtor maintains various insurance policies, which are financed through FIRST Insurance Funding, a Division of Lake Forest Bank & Trust Company, N.A. ("FIRST") and memorialized in a Premium Finance Agreement ("Financing Agreement").  ECF Nos. 140, 150.  The Debtor's prepetition insurance Policies were due to expire on November 10, 2020.  The renewal policies, as set forth in the Financing Agreement, bear a total premium cost of $522,186.62. *Id.*  By order entered on December 29, 2020, the court authorized the Debtor to enter into the Financing Agreement, which includes a security agreement that grants FIRST a secured interest in the policies and all rights therein including all dividends, payments on claims, unearned premiums and unearned commissions.  ECF No. 154.  In the event that the Debtor defaults upon any of the terms of the Financing Agreement, FIRST may exercise its state law rights, up to and including cancelling the policies and applying all unearned insurance premiums to the Debtor's account. *Id.*

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 8

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

20-01808-WLH11    Doc 155    Filed 12/31/20    Entered 12/31/20 14:06:27    Pg 8 of 29

# ARTICLE III.
# FINANCIAL INFORMATION

## A. Debtor's Assets

The Debtor's bankruptcy Schedules A/B reflect the following assets:

### 1. Real Property.

The Debtor does not own any real property. The Debtor subleases the real property upon which it does business from Trina A. Wheeler, its owner. *See* ECF No. 1, Attachment to Schedule A/B, Question 55. The terms of the leases are year-to-year, and the leases automatically renew each January. Ms. Wheeler, a member of the Yakama Tribe, holds long term leases of the real property tracts through the Yakima Nation Land Enterprise, in trust allotted from the Bureau of Indian Affairs. The Debtor farms its tobacco, manufactures its products, and conducts business entirely on Yakama Nation land, ensuring that the beneficial use of the land will be returned to the Tribe and promoting the development and utilization of resources of the Yakama Indian Nation.

### 2. Cash, Receivables, Bonds, Deposits and Prepayments.

The Debtor's bankruptcy schedules reflect the following cash assets as of the Petition Date:

| | |
|---|---|
| Cash and Funds in Various Accounts | $1,579,683.42 |
| Prepaid Insurance | $143,753.62 |
| Legal Retainers | $585,791.30 |
| Accounts Receivable | $1,733,435.39 |
| NPM Tobacco Bonds | $779,000.00 |
| **Total** | **$4,821,663.73** |

The Debtor has a number of Affiliates (as identified in Section III.D), in which it transacts business with to various extents. These transactions have resulted in Affiliate receivables and payables. As of the Petition Date, the Debtor was owed Affiliate accounts receivable as follows:

| | |
|---|---|
| Wheeler Logging | $4,245,580.95 |
| Wheeler Rock Products | $1,521,198.38 |
| Wheeler Fuel Distribution | $249,999.72 |
| Wheeler Pawn Stars | $282,993.20 |

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 9

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

| | |
|---|---|
| Wheeler Cattle | $1,968,337.14 |
| Mountain Tobacco Distributing | $4,760,351.18 |
| **Total** | **$13,028,460.57** |

(collectively, the "<u>Affiliate Receivables</u>" and each, an "<u>Affiliate Receivable</u>"). A more detailed discussion of the Affiliates and their respective relationships and transactions with the Debtor is set forth in Section III.D below. Any Affiliate payables (the "<u>Affiliate Payables</u>") are identified in Section III.B.5.

### 3. Escrow Accounts for Qualified Settlement Funds.

As discussed above in Section II.A.2, the Debtor, as an NPM, is obligated to comply with the Escrow Statutes established pursuant to the MSA. In order to comply with the Escrow Statutes, the Debtor established an escrow account in each respective Settling State in which the Debtor sells its products, as set forth below (the "<u>Escrow Accounts</u>"). As of the Petition Date, the Debtor maintained the following segregated Escrow Accounts with Truist Bank:

| State | Account No. (last 4 digits) | Balance |
|---|---|---|
| Alabama | 0029 | $742.89 |
| California | 0047 | $215.47 |
| Colorado | 0056 | $126.20 |
| Connecticut | 0261 | $5,248.44 |
| Georgia | 0065 | $1,004,886.14 |
| Idaho | 0074 | $2,035,077.92 |
| Indiana | 0083 | $4,217,901.84 |
| Kansas | 0092 | $279,642.10 |
| Kentucky | 0109 | $14,379,787.98 |
| Montana | 0118 | $3,447,752.26 |
| North Carolina | 0154 | $14,541,058.45 |
| North Dakota | 0243 | $8,051.89 |
| New Hampshire | 0136 | $31.81 |
| New Mexico | 0145 | $255,492.10 |
| Nevada | 0127 | $201,501.09 |
| Oregon | 0163 | $870,141.73 |
| Pennsylvania | 0172 | $109.74 |
| South Carolina | 0181 | $5,191,185.60 |
| Virginia | 0234 | $35,870.30 |

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

| State | Account No. (last 4 digits) | Balance |
|-------|------------------------------|---------|
| Washington | 0190 | $5,295,992.31 |
| Wyoming | 0207 | $610.45 |
| **Total** | | **$51,771,426.71** |

Pursuant to the various Settling States' Escrow Statutes, the funds must remain in escrow for 25 years after deposit. These funds serve as a "reserve fund" to satisfy potential state claims against the Debtor akin to those which prompted the MSA. If there are no state judgments or settlements against King Mountain within the 25-year period, those funds revert to King Mountain on a rolling basis. In the meantime, the funds in the Escrow Accounts are segregated from the Debtor's assets and cannot be used for any purpose other than to satisfy potential state claims. The Escrow Accounts are therefore "qualified settlement funds" within the meaning of 26 C.F.R. § 1.468B-1.

### 4. Inventory, Materials, and Fixed Assets.

The Debtor's bankruptcy schedules reflect the following inventory, materials, and fixed assets as of the Petition Date:

| | |
|---|---|
| Inventory, Raw Materials, and Supplies | $3,757,131.40 |
| Farming Assets | $4,703,705.29 |
| Office Furniture, Fixtures, and Equipment | $26,383.10 |
| Vehicles | 144,780.00 |
| Production Machinery and Equipment | 1,878,285.31 |
| Intangibles and Intellectual Property | Unknown |
| **Total** | **$10,510,285.10** |

## B. Debtor's Liabilities

### 1. Department of Treasury, Alcohol and Tobacco Tax & Trade Bureau.

The Debtor is obligated to the TTB based upon federal excise taxes, penalties and interest. The TTB's Claim is secured pursuant to 26 U.S.C. § 6321 and Washington UCC Financing Statement File No. 2020-269-8819-9. As of the Petition Date, the TTB alleges that the Debtor owed the TTB approximately $75,386,614.25.

///

///

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

**2. Priority Tax Claims.** According to the Schedules and Proofs of Claim that have been filed in this Bankruptcy Case, there are the following Priority Claims:

| Claimant | Type of Claim | Amount |
|---|---|---|
| Internal Revenue Service | Taxes | $103,669.48 |
| **Total:** | | **$103,669.48** |

**3. Prepetition Settlements.** King Mountain has entered into final settlement agreements (the "Prepetition Settlements") with the State of Indiana, State of South Carolina, Food and Drug Administration, and United States Department of Agriculture for outstanding unpaid taxes. As of the Petition Date, the Debtor owed the following amounts under the Prepetition Settlements:

| Claimant | Type of Claim | Amount |
|---|---|---|
| State of Indiana | NPM Escrow Deposits | $3,506,121.00 |
| State of South Carolina | NPM Escrow Deposits | $2,520,567.98 |
| U.S. Food and Drug Administration | Tobacco User Fees | $2,520,567.98 |
| U.S. Department of Agriculture | Tobacco Assessments | $2,520,567.98 |
| **Total:** | | **$11,067,824.94** |

**4. Scheduled Non-Priority General Unsecured Claims (Non-Affiliate Payables).** The Debtor's records reflect the following unsecured claims, not including the Affiliate Payables, reflected in Section III.B.5:

| Claimant | Amount Claimed |
|---|---|
| Internal Revenue Service | $668,620.45 |
| Alliance One Specialty Prods., LLC | $2,160.00 |
| Aramark Uniform Services | $912.48 |
| BIA/NIIMS | $5,594.99 |
| California Franchise Tax Board | $16,029.27 |
| Cascade Valley Lube | $78.69 |
| Cintas Corp. | $239.95 |
| Coastal Farm & Home Supply | $581.86 |
| Coleman Oil Company | $1,515.03 |
| Commercial Tire, Inc. | $2,232.29 |
| Fastenal Company | $275.11 |
| Grease Heads Lube and Oil | $189.10 |
| Guardian Security | $21,225.50 |

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

| Claimant | Amount Claimed |
|---|---|
| H.B. Fuller | $5,972.79 |
| Heritage Bank | $817,950.24 |
| Husch & Husch, Inc. | $219.50 |
| Ideal Lumber & Hardware Inc. | $42.34 |
| Lad Irrigation Company | $3,413.57 |
| Mid Columbia Veterinary Clinic | $74.80 |
| NC Filter Corporation | $49,108.49 |
| Oak Harbor Freight Lines, Inc. | $4,533.10 |
| Office Solutions Northwest Inc. | $582.90 |
| PacifiCorp Power | $8,718.72 |
| Simplot Western Stockman's | $201.93 |
| Tacoma Screw Product, Inc. | $51.28 |
| Taghleef Industries Inc. | $16,442.16 |
| Valley Septic Service | $693.00 |
| Yakama Nation Land Enterprise | $176,659.00 |
| Yakima Valley Transportation LLC | $5,600.00 |

**5.** **Scheduled General Unsecured Claims (Affiliate Payables).** The Debtor's records reflect the following in Payables to Affiliates (defined herein):

| Claimant | Amount Claimed |
|---|---|
| Wheeler Kountry Korner | $9,860.22 |
| Wheeler Rock Products | $13,802.12 |

**6.** **Paycheck Protection Program Loan.** Prepetition, on April 20, 2020, the Debtor entered into a promissory note with Heritage Bank for a SBA Paycheck Protection Program loan in the original principal amount of $814,447.00. The Debtor has applied for forgiveness of the loan and anticipates that it will be forgiven in its entirety by the SBA, which will meaningfully improve the Debtor's financial position to the benefit of creditors.

## C. **The Debtor's Equity**

The Debtor has a single class of shares which are owned by Trina A. Wheeler, a member of the Yakama Tribe. Ms. Wheeler owns all rights attendant to the shares, and no other party holds any rights or options with respect to the Debtor's equity.

///

///

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 13

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

## D. The Debtor's Affiliates

The Debtor has a number of affiliates, including the following:

1. Mountain Tobacco Distributing Inc. Mountain Tobacco Distributing is a Washington licensed S-Corp that distributes King Mountain products in the State of Washington (excluding the Yakima Nation Reservation). Mountain Tobacco has no physical assets. The long-term intercompany amounts were primarily incurred prior to January 2015. This Affiliate Receivable is ultimately not collectible. King Mountain could reduce its price to Mountain Tobacco, allowing it to make a profit, and the excess funds could be paid to King Mountain to reduce the long-term receivable. However, this would result in a reduced profit to King Mountain and King Mountain's net cash flow would be unaffected.

2. Wheeler Fuel Distribution. Wheeler Fuel Distribution is a Yakama Nation licensed LLC founded in late 2015. The company purchases and sells fuel to the two convenience stores owed by Ms. Wheeler. King Mountain financed certain start-up costs, including the purchase of a fuel truck. Wheeler Fuel shall repay King Mountain for its Affiliate Receivable over the course of the next four years.

3. Wheeler Kountry Korner. Originally Kiles Korner, this convenience store, located in Wapato, was purchased by Trina and Delbert Wheeler in 2007. Wheeler Kountry Korner is a Yakama Nation licensed business and sole proprietorship of Ms. Wheeler, with sales primarily composed of fuel and tobacco products. King Mountain Tobacco did not finance the purchase of Wheeler Kountry Korner or its expansion, and all transactions between the entities are at arms' length.

4. Wheeler Smoke N Gas. Wheeler Smoke N Gas, a convenience store located in Mabton, is a Yakama Nation licensed business and sole proprietorship of Ms. Wheeler, with sales primarily composed of fuel and tobacco products. Construction of Wheeler Smoke N Gas began in 2014, and the store opened in early 2015. King Mountain did not fund any of the construction or start-up costs for Wheeler Smoke N Gas, and all transactions between the entities are at arms' length.

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 14

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

5. <u>Wheeler's Pawn Stars</u>. Wheeler Pawn Stars is a Yakama Nation licensed sole proprietorship owned by Mr. Wheeler. Wheeler Pawn Stars was founded in late 2013, and King Mountain financed a portion of the start-up costs. Wheeler Pawn Stars shall repay King Mountain for its Affiliate Receivable over the course of the next four years.

6. <u>Wheeler Logging</u>. Wheeler Logging was the first business founded by Trina and Delbert Wheeler. The business activities consisted primarily of harvesting and hauling timber. As timber prices fell and the number of timber jobs on the Yakama Nation diminished, so did the amount of timber work the company performed. Wheeler Logging has not performed any timber work in the last three years. Wheeler Logging no longer has any significant sources of revenue and, based on the timber market on the Yakama Nation Reservation, it does not anticipate this to change in the near future.

7. <u>Wheeler Rock Products</u>. Wheeler Rock Products is a Yakama Nation licensed LLC founded in 2015. King Mountain financed approximately 15-20% of the start-up costs. Its business activities consist of mining sand and gravel and selling gravel and concrete. Wheeler Rock Products has only recently become profitable, and it shall repay King Mountain for its Affiliate Receivable over the course of the next five years.

8. <u>Wheeler Cattle</u>. Wheeler Cattle is a licensed Yakama Nation entity but not a separate entity from King Mountain for tax purposes. Wheeler Cattle moves cattle to various parcels of land that King Mountain farms. Wages and expenses are paid by King Mountain and recorded as an intercompany payable. Amounts are repaid back to King Mountain as cattle is sold. Any repayment of Wheeler Cattle's respective Affiliate Payable is dependent is cattle sales.

**E.    The Debtor's Management**

Trina A. Wheeler, the Debtor's 100% owner, is the Manager and President of the Debtor. Truman J. Thompson, the Chief Executive Officer and Chief Financial Officer, is also the Vice President of the Debtor. Terryanna Blodgett is the Secretary of the Debtor. Ms. Wheeler and Ms. Blodgett do not draw a salary from the Debtor. Mr. Thompson's current compensation for his full-time employment by the Debtor is $180,000 per year, plus quarterly bonuses of $12,500 awarded at the discretion of the Debtor's Manager. Mr. Thompson's compensation by the Debtor is commensurate

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 15

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

20-01808-WLH11    Doc 155    Filed 12/31/20    Entered 12/31/20 14:06:27    Pg 15 of 29

with other professionals possessing the education, experience and knowledge of the regulatory issues unique to the Debtor's industry, and may be adjusted upward or downward on an annual basis to reflect cost of living and then current market conditions.

**F.      The Debtor's Employees**

The Debtor has more than 60 employees working in various positions across the Debtor's farming, production, sales, distribution, and administrative operations (the "Employees").  All employees have been paid in full and will continue to be paid in full in accordance with their employment agreements.

**G.      The Debtor's Regulatory Environment**

The Debtor is in a heavily regulated industry and must adhere to a myriad of regulations imposed under the MSA, the Escrow Statutes and state-specific complementary statutes, and federal regulations.  The Debtor has been working to resolve its disputes with the TTB and State of New York and, prepetition, had entered into settlement agreements with the State of Indiana, State of South Carolina, FDA, and USDA.  The Debtor has been in compliance with the Escrow Statutes in the states in which it currently sells its products, and the Debtor does not anticipate any further regulatory issues.

**H.      The Debtor's Financial Statements**

Attached to this Disclosure Statement are the following:
Exhibit A – The Debtor's projections for 2020 through 2024
Exhibit B – The Debtor's 2019 Financial Statements
Exhibit C – The Debtor's 2018 Financial Statements

**ARTICLE IV.**
**SUMMARY OF PROPOSED PLAN OF REORGANIZATION**

**A.      Explanation of Impaired and Unimpaired Claims**

The term "Impaired" as used herein refers to those creditors to whom this Disclosure Statement (and the related Ballots and other materials delivered together herewith) are being furnished and who are entitled to accept or reject the Plan.  The

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

Claims in Classes 1–10 are impaired under the Plan, and the holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

The term "Unimpaired" refers to those creditors or equity holders whose claims or interests remain unaltered by the reorganization effectuated by the Plan. Because of this favorable treatment, these creditors are conclusively deemed to have accepted the Plan. Accordingly, under Section 1126(f) of the Bankruptcy Code, it is not necessary to solicit acceptances from the holders of claims or interests in such classes. No Classes are Unimpaired under the Plan and thus, no Class is conclusively deemed to have accepted the Plan with voting.

## B. Classification of Claims and Interests

### 1. Unclassified Claims

The Bankruptcy Code automatically entitles certain types of claims to specific treatment. Such claims are not impaired and are not entitled to vote on the Plan. However, claimants holding such claims are entitled to object to the Plan, so long as the Plan's treatment of such claims is inconsistent with the requirements of the Bankruptcy Code. Accordingly, the Debtor has not classified (i) Administrative Expense Claims, which are Allowed Claims for costs or expenses of the Chapter 11 Case that are allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, which will primarily be comprised of the allowed claims of Professional Persons, and amounts owed the US Trustee pursuant to 28 U.S.C. § 1930; or (ii) Priority Tax Claims, which unsecured income, employment, and other taxes described by 11 U.S.C. § 507(a)(8). The treatment of Unclassified Claims is specified in the Plan.

### 2. Classified Claims and Equity Interests

Class 1:  Secured Claim of Alcohol and Tobacco Tax & Trade Bureau
Class 2:  Secured Claim of FIRST Insurance Funding
Class 3:  Unsecured Claim of State of Indiana
Class 4:  Unsecured Claim of State of South Carolina
Class 5:  Unsecured Claim of the U.S. Department of Agriculture
Class 6:  Unsecured Claim of the U.S. Food & Drug Administration
Class 7:  Administrative Convenience Claims
Class 8:  General Unsecured Claims
Class 9:  Affiliate Claims
Class 10: Equity Interests

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

## C. **Treatment of Classified Claims and Equity Interests**.

As detailed in the Plan, each Allowed Claim in Classes 1–8 will be paid in full, with interest accruing at the rate specified in the Plan, if any, from income generated from the Debtor's business operations and from the proceeds of its Escrow Accounts, as specified in the Plan. The Holder(s) of the Equity Interests shall retain their interests following Confirmation and will continue to own, manage and operate the Debtor and its property. YOU ARE ENCOURAGED TO REVIEW THE TREATMENT OF YOUR CLAIM UNDER THE PLAN WITH CARE.

## ARTICLE V.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Plan constitutes a motion by the Debtor to authorize the Debtor to assume or reject, in its discretion, all executory contracts and unexpired leases of the Debtor except for those assumed or rejected prior to the date of the Confirmation Order. Assumption by the Debtor of an executory contract or unexpired lease means that the Debtor has elected to continue to perform the obligations under such contract or lease, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any. Pursuant to the Plan, each rejected agreement shall be deemed rejected as of the Effective Date.

## ARTICLE VI.
## TAX CONSEQUENCES

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim will depend, among other things, on (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the Holder of the Claim receives consideration in more than one tax year, (c) whether the Holder of the Claim is a resident of the United States, (d) whether all of the consideration by the Holder of the Claim is deemed received by that Holder of the Claim as part of an integrated transaction, (e) whether the Holder of the Claim reports income using the accrual or cash method of accounting, and (f) whether the Holder of the Claim has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

The Debtor anticipates that the tax consequences of the Plan to the Debtor will have no effect on its ability to consummate the Plan. Because the Debtor is an S Corp,

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

any tax consequences arising from implementation of the Plan will flow through to its owner and sole shareholder and will not be payable by the Debtor.

CIRCULAR 230 DISCLAIMER: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT (A) ANY U.S. FEDERAL TAX INFORMATION CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER RPARTY ANY TRANSACTION OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE DEBTORS' SOLICITING ACCEPTANCE OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT.

## ARTICLE VII.
## LIQUIDATION ANALYSIS

The Bankruptcy Code requires that a creditor with a right to vote accept the Plan, or, alternately, that the creditor receive under the Plan at least as much as it would receive if the debtor's assets were liquidated in and the proceeds distributed under a Chapter 7 liquidation. This is generally known as the "best interests" test. As set forth below, the Debtor believes that the Plan satisfies the standard.

To apply the test, the Debtor's assets are valued in the context of a distressed liquidation in a Chapter 7 case by a Chapter 7 trustee appointed by the Bankruptcy Court. The estimated values take into account the costs and expenses of the liquidation, and such additional administrative and priority claims that may result from conversion of the case to a Chapter 7 for the purpose of liquidation. Net liquidation proceeds would be paid to general unsecured creditors only to the extent funds are available after secured creditors have been paid the full value of their collateral and priority creditors receive full payment on their claims.

In this case, the asserted secured claim of the TTB far exceeds the value of the Debtor's assets, even including the value of the Escrow Funds. On information and belief, and based on liquidations of similar qualified escrow accounts of NPM bankruptcy debtors, the Debtor projects a liquidation of the Debtor's reversionary rights in the funds in the Escrow Accounts would likely yield approximately $0.14 on the

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

dollar.  In this case, that would translate into a total return to TTB of less than $10 million on its $75 million claim.  The TTB would also assert that its lien encumbers the balance of the Debtor's assets, the proceeds from the liquidation of which would also be payable to the TTB.  In that event, the TTB would receive payment on only a fraction of this claim, and all other creditors would receive no distributions whatsoever.  In contrast, the Plan provides that all creditors (other than the Class 9 Claims of Affiliates) will be paid 100% of their Allowed Claims.  The Plan provides a much more favorable alternative for creditors and therefore satisfies the best interests of creditors test.

**ARTICLE VIII.**
**RISK FACTORS**

Distributions to Holders of Allowed Claims contemplated under the Plan are contingent upon assumptions, some or all of which could fail to materialize and preclude the Plan from becoming effective or reduce anticipated distributions.  Most important, however, is that the Plan is subject to approval by the various classes of creditors entitled to vote on the Plan pursuant to the Bankruptcy Code and to confirmation of the Plan by the Bankruptcy Court.  No assurance can be given that the Plan will be accepted by the requisite number and amount of creditors or confirmed by the court.

**ARTICLE IX.**
**CONFIRMATION OF THE PLAN**

**A.**     **Voting Procedures**

A ballot to be used for voting your acceptance or rejection of the Plan of Reorganization is being mailed to you together with this Disclosure Statement and Plan.  Holders of claims should read the instructions carefully, complete, date and sign the ballot, and transmit it in the envelope enclosed.  IN ORDER TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE INDICATED ADDRESS BY THE TIME PROVIDED ON THE BALLOT.  FAILURE TO VOTE OR A VOTE TO REJECT THE PLAN WILL NOT AFFECT THE TREATMENT TO BE ACCORDED A CLAIM OR INTEREST IF THE PLAN NEVERTHELESS IS CONFIRMED.

If more than one-half in number of claimants voting and at least two-thirds in amount of the allowed claims of such claimants in each class of claims vote to accept the Plan, such classes will be deemed to have accepted the Plan.  For purposes of

DISCLOSURE STATEMENT FOR DEBTOR'S
PLAN OF REORGANIZATION – Page 20

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

determining whether a class of claims has accepted or rejected the Plan, only the votes of those who have timely returned their ballots will be considered.

## B.   Hearing on Confirmation

The hearing on confirmation of the Plan will be set before the Honorable Whitman L. Holt, United States Bankruptcy Judge, in U.S. Bankruptcy Court for the Eastern District of Washington in Yakima.  Notice of the time and date of that hearing will be provided.  The Bankruptcy Court shall confirm the Plan at that hearing only if certain requirements, as set forth in § 1129 of the Bankruptcy Code, are satisfied.

## C.   Feasibility

The Debtor must also establish that confirmation of the Plan is not likely to be followed by the Debtor's liquidation, or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor, along with its professionals, analyzed the future prospects of the Debtor and its ability to meet its obligations under the Plan and have prepared projections (the "Projections") for the certain Plan periods.  The Projections, and the significant assumptions upon which they are based, are attached as Exhibit A to this Disclosure Statement.  Based on the Projections, the Debtor believes that Confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtor.  To the extent necessary, the Debtor will present additional evidence at the hearing on Confirmation in support of such a finding.

THE PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS INCLUDING, BUT NOT LIMITED TO, RECENT HISTORICAL OPERATING RESULTS AND THE TERMS OF THE PLAN OF REORGANIZATION ON FILE AS OF THE DATE OF THIS DISCLOSURE STATEMENT.  ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE PROJECTIONS.  THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  NO INDEPENDENT AUDITOR HAS COMPILED OR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

WITH RESPECT THERETO. THE PROJECTIONS MADE BY THE DEBTOR CONSTITUTES A FORWARD-LOOKING STATEMENT AS DEFINED IN 15 U.S.C. § 78u-5, AND ARE BASED UPON DATA AVAILABLE AS OF THE DATE OF THIS DISCLOSURE STATEMENT TO THE DEBTOR. IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN THE PROJECTIONS INCLUDE, BUT ARE NOT LIMITED TO, THE ACCURACY OF THE DATA THAT FORM THE BASIS FOR THE PROJECTIONS AND THE GENERAL ECONOMIC CONDITIONS THAT MAY EXIST AT THAT TIME.

THE DEBTOR DOES NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTOR DOES NOT INTEND TO AND DISCLAIMS ANY OBLIGATION TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE OR (B) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

**D.**     **Treatment of Dissenting Classes of Creditors**

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. Upon such a finding, the Bankruptcy Court may confirm the Plan despite the objections of a dissenting class. The Debtor has requested that the Court confirm the Plan even if creditors holding claims in impaired classes do not accept the Plan.

**E.**     **Effect of Confirmation of the Plan**

Confirmation of the Plan shall operate on the Effective Date as a discharge of the Debtor from all claims and indebtedness that arose before the Effective Date, except for those unclassified claims that the Debtor agrees to pay as a continuing obligation. All such discharged claims and indebtedness shall be satisfied by the cash payment or other consideration provided under the Plan. Upon Confirmation, all property of the Debtor shall be free and clear of all claims and interests of creditors, except as otherwise provided in the Plan or the order of the Bankruptcy Court confirming the Plan. The Reorganized Debtor shall be vested with all assets of the Debtor. The provisions of the Plan shall bind the Debtor and all other parties in interest, including any creditor of the

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

Debtor, whether or not such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

**F.      Consequences of the Failure to Confirm the Plan**

In the event the Court declines to confirm the Debtor's Plan, a liquidation might ultimately result, either through a revised Plan under Chapter 11 or conversion of this Chapter 11 case to a bankruptcy under Chapter 7 of the Bankruptcy Code.

RESPECTFULLY SUBMITTED this 31st day of December, 2020.

KING MOUNTAIN TOBACCO COMPANY, INC.


_____*/s/ Truman J. Thompson*_____
By: Truman J. Thompson
Its Chief Executive Officer and
      Corporate Vice President

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dm31et01y1

# EXHIBIT A

*(TO BE PROVIDED)*

# EXHIBIT B

*(TO BE PROVIDED)*

# EXHIBIT C

*(TO BE PROVIDED)*