JAMES L. DAY (WSBA #20474)
RICHARD B. KEETON (WSBA #51537)
BUSH KORNFELD LLP
601 UNION STREET, SUITE 5000
SEATTLE, WA  98101
Tel:  (206) 292-2110
Email:  jday@bskd.com
Email:  rkeeton@bskd.com

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re<br><br>KING MOUNTAIN TOBACCO COMPANY, INC.,<br><br>               Debtor. | No. 20-01808-WLH11<br><br>FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION |

**IMPORTANT:**  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION RELATED TO THE PROPOSED PLAN OF REORGANIZATION WITH RESPECT TO KING MOUNTAIN TOBACCO COMPANY, INC. (THE "DEBTOR"):

PLEASE READ THIS DOCUMENT WITH CARE.  THIS DOCUMENT SUMMARIZES THE TERMS OF THE DEBTOR'S PROPOSED PLAN OF REORGANIZATION.  THE DEBTOR MAY CONTINUE TO NEGOTIATE PAYMENT TERMS WITH ITS CREDITORS, AND THE SPECIFIC TREATMENT OF CLAIMS MAY CHANGE AS A RESULT, BUT THE DEBTOR BELIEVES THAT THE PAYMENT TERMS WHICH THE DEBTOR WILL ASK THE COURT TO APPROVE WILL NOT BE LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

TO ALL PARTIES IN INTEREST:

On September 25, 2020 (the "Petition Date"), the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is presently acting as a debtor in possession.  The Debtor's reorganization case is pending before the above-captioned court.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

This First Amended Disclosure Statement for Debtor's First Amended Plan of Reorganization (the "Disclosure Statement") is submitted by the Debtor and contains information with respect to Debtor's proposed First Amended Plan of Reorganization (the "Plan"). Pursuant to § 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you along with a copy of the proposed Plan to allow you to make an informed decision in exercising your right to accept or reject the proposed Plan. This Disclosure Statement has been approved by order of the court pursuant to § 1125 of the Bankruptcy Code as containing information of a kind, and in sufficient detail, as far as is reasonably practicable under the circumstances, that would enable a hypothetical reasonable investor to make an informed judgment about the Plan. In the event of inconsistencies between the Plan and the Disclosure Statement, however, the terms of the Plan shall control. The court's approval of this Disclosure Statement does not constitute an endorsement of the proposed Plan by the court.

THE ONLY REPRESENTATIONS THAT ARE AUTHORIZED OR THAT MAY BE MADE CONCERNING THE DEBTOR, THE VALUE OF ASSETS, OR THE PLAN ARE CONTAINED IN THIS DISCLOSURE STATEMENT. THE FINANCIAL INFORMATION CONTAINED HEREIN OR INCORPORATED BY REFERENCE HAS BEEN PREPARED BY THE DEBTOR'S MANAGEMENT AND IS EFFECTIVE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE READER SHOULD NOT INFER OR ASSUME THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.

FINANCIAL INFORMATION, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE AND PRUDENT BY MANAGEMENT, MAY NOT BE REALIZED AND WILL REMAIN SUBJECT TO INHERENT UNCERTAINTIES. THE FINANCIAL INFORMATION HAS NOT BEEN SUBJECTED TO AN AUDIT AND FOR THAT REASON THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY. HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY REPRESENTED.

As detailed herein and in the Plan, the Plan provides for full payment to all non-affiliate creditors from the proceeds of its Escrow Accounts , and from amounts generated from the Debtor's business operations, which, in the Debtor's opinion,

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

provides greater recovery than which is likely under a liquidation of King Mountain Tobacco Company. Accordingly, the Debtor believes that approval of the Plan is in the best interests of all creditors.

**ARTICLE I.**
**DEFINITIONS**

Terms used in this Disclosure Statement not specifically defined herein or in the Bankruptcy Code shall be defined as set forth in the Plan that accompanies this Disclosure Statement. In particular, certain capitalized terms shall have the meanings ascribed for such terms in Section II of the Plan.

**ARTICLE II.**
**BACKGROUND INFORMATION**

**A.** **Historical Background and Events Leading to Bankruptcy**

**1.** **The Debtor's Operations and Community Impact**

King Mountain Tobacco Company Inc. is a Native American owned and operated tobacco manufacturer based in White Swan, Washington, within the boundaries of the Yakama Nation Reservation. The Debtor was founded by Delbert and Trina Wheeler and incorporated in November 2005 under the laws of the Yakama Nation, and registered as a foreign corporation with the State of Washington.

The Yakama Nation Reservation has a low per capita income and high poverty rate. King Mountain is a significant employer on the reservation and provides full-time employment for more than 50 individuals.

The Yakama Nation has over 11,000 members. Those who choose to stay on the reservation face a host of economic and social challenges. Poverty, isolation, drug and alcohol abuse, lack of adequate resources to treat mental health issues, family problems and a youth suicide rate 2.5 times greater than the rate among other populations are but a sample of the problems facing the Yakama Nation today. King Mountain has paid over $10 million directly to the Yakama Nation in taxes over the past 10 years, which has been used to assist the community in a variety of ways.

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

### 2. The Master Settlement Agreement and Escrow Accounts

In November 1998, 46 states, five territories, and the District of Columbia (collectively, the "Settling States") agreed with certain major tobacco product manufactures to end years of litigation over tobacco-related illnesses by signing a Master Settlement Agreement (the "MSA"). The remaining four states (Texas, Florida, Minnesota and Mississippi) had previously settled litigation against the major tobacco companies. Under the MSA, the Settling States agreed to dismiss their pending lawsuits (or to refrain from filing suit) against the participating manufacturers ("PMs"), and the PMs agreed to restrict their advertising and marketing practices and make payments to participating states each year in perpetuity.

However, not all tobacco product manufacturers are parties to the MSA (referred to as Non-Participating Manufacturers or "NPMs"), which would have given the NPMs a competitive advantage over PMs. Therefore, the MSA provided incentives for Settling States to pass statutes (the "Escrow Statutes") applicable to NPMs, which generally require NPMs to deposit into an escrow account a specified sum per tobacco unit sold in a state on an annual or quarterly basis. The deposits approximate what the NPMs would pay had they participated in the MSA. The Escrow Statutes also require that NPMs file an annual certification regarding the NPM's compliance with the Escrow Statute and, among other things, a certification that the NPM maintains an escrow account and that the NPM has placed the full amount of the escrow deposit for the preceding year into the escrow account.

To comply with the Escrow Statues, NPMs typically create a master account with a sub-account for each Settling State, and make periodic deposits into the accounts equal to the per-unit charge times the number of units sold within the state. An NPM is generally only allowed to withdraw funds from the escrow accounts to pay a judgment or settlement, or to get a distribution of any income made on the investment of funds in the escrow accounts. The funds deposited roll out of the account and flow back to the NPM if there are no claims made against the account within twenty-five years after each deposit.

The Debtor became subject to the Escrow Statutes when it later began its operations, discussed below. The Debtor currently has approximately $52 million on deposit in Escrow Accounts in order to comply with the Escrow Statutes enacted by the states in which the Debtor sells its tobacco products.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

### 3. The Debtor's Founding and Tax Issues

In early 2000, the Wheelers began developing plans to manufacture premium tobacco products on the Yakama Nation. To that end, the Wheelers sought out a highly experienced tobacco blender to create King Mountain's premium blend, and ultimately engaged Jaime Aburto to serve in that capacity. He was with the Debtor since its inception up until September 2019.

In establishing King Mountain, the Wheelers faced all the hurdles that make business development on Native American Reservations challenging. Among these challenges, the Wheelers could not use their allotted lands as collateral for start-up capital, so they had to fund all expansion from cash flow generated by their other businesses.

In February 2007, the Debtor received its permit to manufacture cigarettes from the Alcohol and Tobacco Tax and Trade Bureau (the "TTB"). The permit was first listed for purposes of the MSA in Washington State in the fall of 2007. Over time the Debtor expanded its sales, and currently sells in 12 states.

From the start, however, it was (and remains) difficult for King Mountain to secure distributors. The "Big Tobacco" manufacturers have significant control over distribution channels, and generally bar their distributors from carrying lower priced competitors' products.

As the Debtor sought to identify available distribution channels, it entered into agreements with individuals that were unable to deliver on promised levels of purchasing. This in turn led to cash flow difficulties in about 2009, which were exacerbated in late 2010 and early 2011 when the Debtor shipped 11 truckloads of product to a distributor in South Carolina for which the Debtor was never paid. This resulted in a loss to King Mountain of nearly $16 million in immediate cash flow. These cash flow issues, combined with advice of counsel and the Debtor's firmly held belief regarding the protections guaranteed in the Yakama Treaty, led to its very first failure to pay federal excise taxes ("FET").

In 2011, the Debtor filed a complaint against the United States for a declaratory judgment and other relief, seeking a finding that King Mountain was exempt from federal excise taxes and requesting a refund of all amounts paid, arguing that it was not subject to taxation under the General Allotment Act of 1887, 4 Stat. 388, nor the Treaty with the Yakamas of 1855, 12 Stat. 951. The District Court for the Eastern District of

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

Washington ruled in favor of the United States, upheld the excise taxes imposed by the TTB, and entered a declaratory judgment against the Debtor.  The Debtor appealed, and the Ninth Circuit Court of Appeals remanded the case to the District Court to vacate its order granting the United States' motion for summary judgment and instead dismiss the action, finding that the lawsuit was barred by the Anti-Injunction Act.  The mandate was entered on February 6, 2017.

In 2012, the United States commenced a separate action against King Mountain in the District Court to reduce the tax liabilities to judgment.  The Ninth Circuit Court of Appeals affirmed the judgment of the District Court, which found in favor of the United States and against King Mountain, finding King Mountain liable for taxes, penalties, and interest in an amount of almost $58 million, plus interest and other statutory additions accruing thereafter until paid in full.  The mandate was entered on October 30, 2018, and the U.S. Supreme Court denied King Mountain's petition for writ of certiorari on June 10, 2019.  As of today, the amount owed totals about $75 million of principal, interest and penalties.

Notwithstanding these challenges, King Mountain has remained in operations and remains current on all FET and escrow obligations since April of 2013.  King Mountain is approved for sale in 12 states.  King Mountain has entered into final settlement agreements with Indiana, South Carolina and the Food and Drug Administration for prior unpaid taxes.  King Mountain has also entered an interim repayment plan with the United States Department of Agriculture for outstanding taxes.  Up to the Petition Date, King Mountain had remained current on all payments per the various settlement agreements.

The Debtor, through counsel, has been in communication with the Department of Justice to work towards an agreement to settle the outstanding debt associated with unpaid FET.  During this process, the Debtor provided documents detailing its financial position to show available cash flow for potential repayments.  Notwithstanding, in August 2020, the Department of the Treasury sent the Debtor a final notice and demand for repayment of the outstanding FET.  According to the government's calculation, the amount owed is $75,386,614.25, consisting of approximately $38,316,481.34 in principal, $18,340,409.86 in interest, and $18,729,723.05 in penalties.  The government threatened to levy against the Debtor' assets if payment was not made within thirty days of the Debtor's receipt of the demand letter.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

The Debtor is not in a financial position to repay the approximately $75 million owed to TTB, and a levy of the Debtor's assets would likely result in the cessation of the Debtor's operations and the loss of jobs on the Yakama Nation Reservation. The Debtor therefore made the difficult decision to commence this case, to provide it with an opportunity to address its outstanding obligations in a manner that allows it to remain in operation going forward.

**B.** **Significant Post-Petition Activity in the Bankruptcy Case**

**1.** **Debtor-in-Possession.** The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed to serve in this reorganization case.

**2.** **No Appointment of Committee.** On October 23, 2020, the US Trustee filed a notice that, despite efforts to contact eligible unsecured creditors, the US Trustee had not received a sufficient number of creditors willing to serve on a committee, and accordingly, the US Trustee is unable to appoint a committee pursuant to 11 U.S.C. § 1102(a). ECF No. 68.

**3.** **Orders on Wages and Utilities.** On October 1, 2020, the court entered an order authorizing the Debtor's payment of prepetition payroll, employee benefits, and related expenses. ECF No. 26. Also on October 1, 2020, the court entered interim orders approving the Debtor's proposed adequate protection to utility providers (the "Utility Order"). ECF Nos. 24. After notice to Utility Providers and receiving no responses, the Utility Order became final on October 27, 2020.

**4.** **Employment of Professionals.** The Court entered orders authorizing the employment of the following professionals pursuant to Bankruptcy Code § 327.

| Professional | Role | Order Entered | Docket No. |
|---|---|---|---|
| Bush Kornfeld LLP | Primary Bankruptcy Counsel to Debtor | 10/30/2020 | 102 |
| Northen Blue, LLP | Advisory Bankruptcy Counsel to Debtor | 10/30/2020 | 103 |
| Troutman Pepper Hamilton Sanders LLP | Regulatory Compliance Counsel to Debtor | 10/30/2020 | 104 |
| Baker & Hostetler LLP | Litigation Special Counsel to Debtor | 10/30/2020 | 105 |

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 7

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

| Professional | Role | Order Entered | Docket No. |
|---|---|---|---|
| Petrillo Klein & Boxer LLP | Litigation Special Counsel to Debtor | 10/30/2020 | 106 |
| Bell & Bridges, CPAs | Tax Preparer for Debtor | 10/30/2020 | 107 |

**5.     Approval of the Debtor's Continued Use of Prepetition Cash Management System and Escrow Accounts.**  The US Trustee objected to the Debtor's continued use of existing bank accounts and escrow accounts primarily on the bases that the Debtor's business checking accounts are not managed by banks included on the US Trustee's list of Authorized Depositories in Eastern Washington, have not posted bonds or other securities in favor of the United States, and therefore do not meet the protection requirements of Code section 345(b).  *See* ECF No. 14.  Following an initial hearing on October 1, 2020, the matter was continued to allow the parties to resolve the US Trustee's objections, and the court entered an interim order to facilitate those efforts.  ECF No. 25.  After the continued hearing on November 2, 2020, the court issued a second interim order and took the matter under advisement.  ECF No. 120.  The court issued a memorandum opinion concluding that the statute provides specific authority for the court to waive the requirements imposed under 345(b), and finding cause in this case to waive the requirements.  ECF No. 127.  On November 30, 2020, the court granted the Debtor's motion and authorized it to continue using its existing Cash Management System, including its prepetition Bank Accounts, checks, and Escrow Accounts, and waiving the requirements of Code section 345(b).

**6.     Approval of Debtor's Use of Cash Collateral.**  One day prior to the Petition Date, on September 24, 2020, the TTB filed a UCC Financing Statement and Notice of Federal Tax Lien with the State of Washington Department of Licensing.  The Federal Tax Lien, if properly perfected, constitutes a prepetition lien in favor of the United States "upon all property and rights to property, whether real or personal," belonging to the Debtor, pursuant to 26 U.S.C. § 6321.  King Mountain did not receive notice of the Notice of Federal Tax Lien until October 15, 2020, almost three weeks after this case was filed.  Upon receiving notice of the UCC filing and confirmation of the same from the Secretary of State, the Debtor promptly moved the court for an order authorizing use of cash collateral and granting adequate protection.  *See* ECF No. 88.

On November 2, 2020, the court entered an order authorizing the Debtor's interim use of cash collateral, and authorized the Debtor to provide adequate protection to the TTB.  ECF No. 112.  After a final hearing, on December 10, 2020, the Court

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 8

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

20-01808-WLH11    Doc 198    Filed 03/17/21    Entered 03/17/21 16:30:20    Pg 8 of 30

entered a final order authorizing the Debtor's use of cash collateral pursuant to an approved Budget, and authorizing the Debtor to grant adequate protection in favor of the TTB in the form of post-petition replacement liens. ECF No. 144.

   7.    **FIRST Insurance Funding.**  In the ordinary course of the Debtor's business, the Debtor maintains various insurance policies, which are financed through FIRST Insurance Funding, a Division of Lake Forest Bank & Trust Company, N.A. ("FIRST") and memorialized in a Premium Finance Agreement ("Financing Agreement"). ECF Nos. 140, 150. The Debtor's prepetition insurance Policies were due to expire on November 10, 2020. The renewal policies, as set forth in the Financing Agreement, bear a total premium cost of $522,186.62. *Id.* By order entered on December 29, 2020, the court authorized the Debtor to enter into the Financing Agreement, which includes a security agreement that grants FIRST a secured interest in the policies and all rights therein including all dividends, payments on claims, unearned premiums and unearned commissions. ECF No. 154. In the event that the Debtor defaults upon any of the terms of the Financing Agreement, FIRST may exercise its state law rights, up to and including cancelling the policies and applying all unearned insurance premiums to the Debtor's account. *Id.*

**ARTICLE III.**
**FINANCIAL INFORMATION**

A.    **Debtor's Assets**

   The Debtor's bankruptcy Schedules A/B reflect the following assets:

   1.    **Real Property.**

   The Debtor does not own any real property. The Debtor lease and subleases the real property upon which it does business from Trina A. Wheeler, its owner. *See* ECF No. 1, Attachment to Schedule A/B, Question 55. The terms of the leases are year-to-year, and the leases automatically renew each January. Ms. Wheeler, a member of the Yakama Tribe, holds long term leases of the real property tracts through the Yakama Nation Land Enterprise, in trust allotted from the Bureau of Indian Affairs. Ms. Wheeler also owns property within the Yakama Nation, a portion of which she also leases to the Debtor. The Debtor farms its tobacco, manufactures its products, and conducts business entirely on Yakama Nation land, ensuring that the beneficial use of the land will be returned to the Tribe and promoting the development and utilization of resources of the Yakama Indian Nation.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

## 2. Cash, Receivables, Bonds, Deposits and Prepayments.

The Debtor's bankruptcy schedules reflect the following cash assets as of the Petition Date:

| | |
|---|---|
| Cash and Funds in Various Accounts | $1,579,683.42 |
| Prepaid Insurance | $143,753.62 |
| Legal Retainers | $585,791.30 |
| Accounts Receivable | $1,733,435.39 |
| NPM Tobacco Bonds | $779,000.00 |
| **Total** | **$4,821,663.73** |

The Debtor has a number of Affiliates (as identified in Section III.D), in which it transacts business with to various extents. These transactions have resulted in Affiliate receivables and payables. As of the Petition Date, the Debtor was owed Affiliate accounts receivable as follows:

| | |
|---|---|
| Wheeler Logging | $4,245,580.95 |
| Wheeler Rock Products | $1,521,198.38 |
| Wheeler Fuel Distribution | $249,999.72 |
| Wheeler Pawn Stars | $282,993.20 |
| Wheeler Cattle | $1,968,337.14 |
| Mountain Tobacco Distributing | $4,760,351.18 |
| **Total** | **$13,028,460.57** |

(collectively, the "Affiliate Receivables" and each, an "Affiliate Receivable"). Beginning on the Effective Date of a confirmed Plan of Reorganization, interest shall accrue on the Affiliate Receivables at the Federal Judgment Rate. A more detailed discussion of the Affiliates and their respective relationships and transactions with the Debtor is set forth in Section III.D below. Any Affiliate payables (the "Affiliate Payables") are identified in Section III.B.5.

## 3. Escrow Accounts for Qualified Settlement Funds.

As discussed above in Section II.A.2, the Debtor, as an NPM, is obligated to comply with the Escrow Statutes established pursuant to the MSA. In order to comply with the Escrow Statutes, the Debtor established an escrow account in each respective Settling State in which the Debtor sells its products, as set forth below (the "Escrow Accounts"). As of the Petition Date, the Debtor maintained the following segregated Escrow Accounts with Truist Bank:

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 10

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

20-01808-WLH11   Doc 198   Filed 03/17/21   Entered 03/17/21 16:30:20   Pg 10 of 30

| State | Account No. (last 4 digits) | Balance |
|---|---|---|
| Alabama | 0029 | $743 |
| California | 0047 | $215 |
| Colorado | 0056 | $126 |
| Connecticut | 0261 | $5,248 |
| Georgia | 0065 | $1,004,886 |
| Idaho | 0074 | $2,091,766 |
| Indiana | 0083 | $4,217,902 |
| Kansas | 0092 | $279,642 |
| Kentucky | 0109 | $14,539,446 |
| Montana | 0118 | $3,616,656 |
| North Carolina | 0154 | $14,833,043 |
| North Dakota | 0243 | $11,171 |
| New Hampshire | 0136 | $32 |
| New Mexico | 0145 | $255,492 |
| Nevada | 0127 | $239,564 |
| Oregon | 0163 | $1,002,089 |
| Pennsylvania | 0172 | $110 |
| South Carolina | 0181 | $5,191,186 |
| Virginia | 0234 | $35,900 |
| Washington | 0190 | $5,749,384 |
| Wyoming | 0207 | $610 |
| **Total** | | **$53,075,212** |

Pursuant to the various Settling States' Escrow Statutes, the funds must remain in escrow for 25 years after deposit. These funds serve as a "reserve fund" to satisfy potential state claims against the Debtor akin to those which prompted the MSA. If there are no state judgments or settlements against King Mountain within the 25-year period, those funds revert to King Mountain on a rolling basis. In the meantime, the funds in the Escrow Accounts are segregated from the Debtor's assets and cannot be used for any purpose other than to satisfy potential state claims. The Escrow Accounts are therefore "qualified settlement funds" within the meaning of 26 C.F.R. § 1.468B-1.

### 4. Inventory, Materials, and Fixed Assets.

The Debtor's bankruptcy schedules reflect the following inventory, materials, and fixed assets as of the Petition Date:

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 11

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

20-01808-WLH11   Doc 198   Filed 03/17/21   Entered 03/17/21 16:30:20   Pg 11 of 30

| Inventory, Raw Materials, and Supplies | $3,757,131.40 |
|---|---|
| Farming Assets | $4,703,705.29 |
| Office Furniture, Fixtures, and Equipment | $26,383.10 |
| Vehicles | $144,780.00 |
| Production Machinery and Equipment | $1,878,285.31 |
| Intangibles and Intellectual Property | Unknown |
| **Total** | **$10,510,285.10** |

5.     **Avoidance Claims.**

As defined in the Plan, an Avoidance Claim is "Any Claim or cause of action of the Estate arising out of or maintainable pursuant to Chapter V of the Bankruptcy Code or under any other similar applicable law."  Generally, Avoidance Claims are comprised of (i) actions to avoid and recover preferential transfers pursuant to §§ 547 and 550 of the Bankruptcy Code (with a look-back period of 90 days prior to the Petition Date for non-insiders and one year prior to the Petition Date for insiders (as defined in Section 101(31) of the Bankruptcy Code)); (ii) actions to avoid and recover fraudulent transfers pursuant to §§ 548 and 550 of the Bankruptcy Code (with a look-back period of two years), or under applicable non-bankruptcy law pursuant to §§ 544 and 550 of the Bankruptcy Code (with a look-back period that is greater than two years); or (iii) certain unauthorized transactions of the Debtor following the Petition Date pursuant to §§ 549 and 550 of the Bankruptcy Code.

The Debtor listed in its Statement of Financial Affairs [ECF No. 1] ("SOFA") various payments that it made to insiders and non-insiders during the periods one year and ninety days, respectively, prior to the Petition Date, some of which may qualify as Avoidance Claims:

- Payments to Indiana, South Carolina, USDA and FDA:  The Debtor made each of the payments to each of these governmental entities as set forth in the SOFA in strict compliance with the terms of a settlement agreement or payment plan it had earlier entered into with the governmental entity. Each payment is likely a preference under Bankruptcy Code § 547(b). However, the Debtor believes that each payment would fall well within the scope of the "ordinary course of business" exception under Bankruptcy Code § 547(c)(2) and would not be avoidable.  The Plan therefore makes no provision for and is not dependent upon the recovery of any prepetition transfers to these entities.

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 12

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

- <u>Payments to Wheeler Kountry Korner</u>:  This entity sells fuel to the Debtor on account, and the payments the Debtor made prior to the Petition Date (totaling approximately $181,000) were against this account.  Some portion of the payments would be excepted from avoidance and recovery pursuant to Bankruptcy Code § 547(c)(2), while arguably other portions might not.  The Debtor estimates that some $30,000 to $50,000 of these payments might be subject to avoidance.  However, the Debtor is indebted to Wheeler Kountry Korner in the approximate amount of $584,000.  Therefore, given the risks and costs of litigation in connection with the amount at issue, and notwithstanding Bankruptcy Code § 502(d), Section VII.E.2 of the Plan provides that Wheeler Kountry Korner's Claim shall be reduced by the amount of $50,000 in satisfaction of any alleged Avoidance Claim.

- <u>Payments to Wheeler Rock Products</u>: The Debtor purchased gravel on account and made each of these (2) payments (totaling $16,885.06) in accordance with the repayment terms between the parties.  The Debtor believes that each payment would fall well within the scope of the "ordinary course of business" exception under Bankruptcy Code § 547(c)(2) and would not be avoidable.  The Plan therefore makes no provision for and is not dependent upon the recovery of any prepetition transfers to this entity.

- <u>Payments to Wheeler Logging</u>:  Wheeler Logging is an entity wholly owned by the Equity Holder.  The Debtor made payments to Wheeler Logging totaling $280,000 during the year prior to the Petition Date for management services, the last of which was made some six months prior to the Petition Date.  There is presumably an issue as to whether the Debtor received "reasonably equivalent value" for purposes of whether some portion of the payments is avoidable under Bankruptcy Code § 548(a)(1).  As a practical matter, the Debtor understands that Wheeler Logging has little income and no ability to pay any sizable judgment against it.  Accordingly, the Debtor and the Equity Holder have agreed that the potential liability of Wheeler Logging will be resolved by way of the setoff of lease payments that would otherwise be owing to the Equity Holder in connection with the New Lease, up to a total setoff of $280,000, following which payments to the Equity Holder shall proceed as set forth in the New Lease.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

**B.** **Debtor's Liabilities**

    **1.** **Department of Treasury, Alcohol and Tobacco Tax & Trade Bureau.**

    The Debtor is obligated to the TTB based upon federal excise taxes, penalties and interest. The TTB's Claim is secured pursuant to 26 U.S.C. § 6321 and Washington UCC Financing Statement File No. 2020-269-8819-9. As of the Petition Date, the TTB alleges that the Debtor owed the TTB approximately $75,386,614.25.

    **2.** **Priority Tax Claims.** According to the Schedules and Proofs of Claim that have been filed in this Bankruptcy Case, there are the following Priority Claims:

| Claimant | Type of Claim | Amount |
|---|---|---|
| Internal Revenue Service | Taxes | $73,570.59 |
| **Total:** | | **$73,570.59** |

    **3.** **Prepetition Settlements.** King Mountain has entered into final settlement agreements or agreed payment plans with the State of Indiana, the State of South Carolina, United States Food and Drug Administration, and United States Department of Agriculture for outstanding unpaid taxes. As of the Petition Date, the Debtor believes the following amounts are owing to these entities:

| Claimant | Type of Claim | Amount |
|---|---|---|
| State of Indiana | NPM Escrow Deposits | $3,506,121.00 |
| State of South Carolina | NPM Escrow Deposits | $2,520,567.98 |
| U.S. Food and Drug Administration | Tobacco User Fees | $2,903,104.13 |
| U.S. Department of Agriculture | Tobacco Assessments | $5,289,418.88 |
| **Total:** | | **$14,219,211.99** |

    **4.** **Scheduled Non-Priority General Unsecured Claims (Non-Affiliate Payables).** The Debtor's records reflect the following unsecured claims, not including the Affiliate Payables, reflected in Section III.B.5:

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 14

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

| Claimant | Amount Claimed |
|---|---|
| Internal Revenue Service | $560,654.54 |
| Alliance One Specialty Prods., LLC | $2,160.00 |
| Aramark Uniform Services | $342.18 |
| BIA/NIIMS | $5,594.99 |
| California Franchise Tax Board | $16,029.27 |
| Cascade Valley Lube | $78.69 |
| Cintas Corp. | $239.95 |
| Coastal Farm & Home Supply | $581.86 |
| Coleman Oil Company | $1,515.03 |
| Commercial Tire, Inc. | $2,232.29 |
| Fastenal Company | $275.11 |
| Grease Heads Lube and Oil | $189.10 |
| Guardian Security | $21,225.50 |
| H.B. Fuller | $5,972.79 |
| Heritage Bank | $817,950.24 |
| Husch & Husch, Inc. | $219.50 |
| Ideal Lumber & Hardware Inc. | $42.34 |
| Lad Irrigation Company | $3,413.57 |
| Mid Columbia Veterinary Clinic | $74.80 |
| NC Filter Corporation | $49,108.49 |
| Oak Harbor Freight Lines, Inc. | $4,533.10 |
| Office Solutions Northwest Inc. | $582.90 |
| PacifiCorp Power | $8,718.72 |
| Simplot Western Stockman's | $201.93 |
| Tacoma Screw Product, Inc. | $51.28 |
| Taghleef Industries Inc. | $16,442.16 |
| Valley Septic Service | $693.00 |
| Yakama Nation Land Enterprise | $176,659.00 |
| Yakima Valley Transportation LLC | $5,600.00 |

**5.** **Scheduled General Unsecured Claims (Affiliate Payables).** The Debtor's records reflect the following in Payables to Affiliates (defined herein):

| Claimant | Amount Claimed |
|---|---|
| Wheeler Kountry Korner | $584,136.57 |
| Wheeler Rock Products | $13,802.12 |

**6.** **Paycheck Protection Program Loan.** Prepetition, on April 20, 2020, the Debtor entered into a promissory note with Heritage Bank for a SBA Paycheck Protection Program loan in the original principal amount of $814,447.00. The Debtor later applied for forgiveness of the loan. By letter dated January 22, 2021, Heritage Bank advised that the loan had been fully forgiven:

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 15

Bush Kornfeld llp
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

20-01808-WLH11    Doc 198    Filed 03/17/21    Entered 03/17/21 16:30:20    Pg 15 of 30

We are pleased to notify you that your loan forgiveness application under the Paycheck Protection Program (PPP) has been approved. Your PPP promissory note has been marked as paid in full, and you have no further payment obligations at this time.

If the Small Business Administration (SBA) should determine that your loan forgiveness is revoked, rescinded, canceled or reduced in any amount and, subsequently, any forgiveness payment made on your loan under the PPP by the SBA is recalled for any reason, requiring Heritage Bank to return any prior forgiveness payment, your promissory note will be reinstated with respect to any such payment.

While it appears there is some residual possibility that the SBA might revoke the forgiveness on some unknown basis, the forgiveness of the PPP loan has meaningfully improved the Debtor's financial position to the benefit of creditors.

## C.    **The Debtor's Equity**

The Debtor has a single class of shares which are owned by Trina A. Wheeler, a member of the Yakama Tribe. Ms. Wheeler owns all rights attendant to the shares, and no other party holds any rights or options with respect to the Debtor's equity.

## D.    **The Debtor's Affiliates**

The Debtor has a number of Affiliates, including the following. To the extent the Debtor transacts or continues to transact business with Affiliates, such transactions will be conducted at the same prices and terms offered to third party non-affiliates.

1. <u>Mountain Tobacco Distributing Inc</u>. Mountain Tobacco Distributing ("<u>Distributing</u>") is a Washington licensed S-Corp that distributes King Mountain products in the State of Washington (excluding the Yakama Nation Reservation). Distributing has no physical assets; the only expenses Distributing has is the cost of cigarettes and cost of cigarette stamps required to be affixed to cigarettes sold. Distributing was initially contemplated as a break-even company, charging its customers only the amount it was charged by King Mountain for cigarettes, plus the cost of the cigarette stamp. However, initially King Mountain charged more to Distributing for its products than the price Distributing would sell King Mountain products to its Washington State distributors and Tribes. This at times would leave

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 16

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

20-01808-WLH11    Doc 198    Filed 03/17/21    Entered 03/17/21 16:30:20    Pg 16 of 30

Distributing with insufficient funds to purchase cigarette stamps to affix to cigarettes. In turn, King Mountain, would transfer funds to Distributing to purchase the required stamps. Those transfers were recorded as long-term intercompany transactions. To correct this process, in 2016 King Mountain adjusted its prices charged to Distributing so that Distributing would be at break even and no longer have a loss or negative cash flow. Accordingly, this Affiliate Receivable is ultimately not collectible. King Mountain could reduce its price to Mountain Tobacco, allowing it to make a profit, and the excess funds could be paid to King Mountain to reduce the long-term receivable. However, this would result in a reduced profit to King Mountain and King Mountain's net cash flow would be unaffected. King Mountain expects to continue doing business with Distributing for the foreseeable future.

2. <u>Wheeler Fuel Distribution</u>. Wheeler Fuel Distribution ("<u>Wheeler Fuel</u>") is a Yakama Nation licensed LLC founded in late 2015. The company purchases and sells fuel to the two convenience stores owned by the Equity Holder. King Mountain financed certain start-up costs, including the purchase of a fuel truck. As set forth in the Plan, Wheeler Fuel shall repay the Debtor the full amount of the Affiliate Receivable in equal payments made each calendar quarter over the course of four years following the Effective Date. King Mountain expects to continue doing business with Wheeler Fuel for the foreseeable future. All transactions between the entities will be conducted at the same prices and terms offered to third party non-affiliates.

3. <u>Wheeler Kountry Korner</u>. Originally Kiles Korner, Wheeler Kountry Korner ("<u>Kountry Korner</u>"), a convenience store located in Wapato, Washington, was purchased by Trina and Delbert Wheeler in 2007. Kountry Korner is a Yakama Nation licensed business and sole proprietorship of the Equity Holder, with sales primarily composed of fuel and tobacco products. King Mountain did not finance the purchase of Wheeler Kountry Korner or its expansion. King Mountain expects to continue doing business with Kountry Korner for the foreseeable future, and all transactions between the entities will be conducted at the same prices and terms offered to third party non-affiliates.

4. <u>Wheeler Smoke N Gas</u>. Wheeler Smoke N Gas ("<u>Smoke N Gas</u>"), a convenience store located in Mabton, Washington, is a Yakama Nation licensed business and sole proprietorship of the Equity Holder, with sales

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

primarily composed of fuel and tobacco products. Construction of Smoke N Gas began in 2014, and the store opened in early 2015. King Mountain did not fund any of the construction or start-up costs for Smoke N Gas. King Mountain expects to continue doing business with Smoke N Gas for the foreseeable future, and all transactions between the entities will be conducted at the same prices and terms offered to third party non-affiliates.

5. <u>Wheeler's Pawn Stars</u>. Wheeler Pawn Stars ("<u>Pawn Stars</u>") is a Yakama Nation licensed sole proprietorship owned by the Equity Holder. Pawn Stars was founded in late 2013, and King Mountain financed a portion of the start-up costs. As set forth in the Plan, Pawn Stars shall repay the Debtor the full amount of the Affiliate Receivable in equal payments each calendar quarter over the course of four years following the Effective Date. King Mountain expects to continue doing business with Pawn Stars for the foreseeable future, and all transactions between the entities will be conducted at the same prices and terms offered to third party non-affiliates.

6. <u>Wheeler Logging</u>. Wheeler Logging ("<u>Logging</u>") was the first business founded by Trina and Delbert Wheeler. The business activities consisted primarily of harvesting and hauling timber. The majority of the funds from King Mountain were advanced between 2010 and 2013. As timber prices fell and the number of timber jobs on the Yakama Nation diminished, so did the amount of timber work the company performed. Logging has not performed any timber work in the last three years. Logging no longer has any significant sources of revenue and, based on the timber market on the Yakama Nation Reservation, it does not anticipate this to change in the near future. The Debtor has no plans to conduct business with Wheeler Logging in the foreseeable future.

7. <u>Wheeler Rock Products</u>. Wheeler Rock Products ("<u>Rock Products</u>") is a Yakama Nation licensed LLC founded in 2015. King Mountain financed approximately 15-20% of its start-up costs. Rock Products' business activities consist of mining sand and gravel and selling gravel and concrete. Rock Products has only recently become profitable. As set forth in the Plan, Wheeler Rock Products shall repay the Debtor the full amount of the Affiliate Receivable in equal payments each calendar quarter over the course of five years following the Effective Date. The Debtor has limited need for gravel and concrete products, and as such the Debtor intends to do business with Rock Products on an as-needed basis, and any future transactions between the

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 18

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

20-01808-WLH11    Doc 198    Filed 03/17/21    Entered 03/17/21 16:30:20    Pg 18 of 30

entities will be conducted at the same prices and terms offered to third party non-affiliates.

8. <u>Wheeler Cattle</u>.  Wheeler Cattle is a licensed Yakama Nation entity but not a separate entity from King Mountain for tax purposes.  Wheeler Cattle moves cattle to various parcels of land that King Mountain farms.  Currently, wages and expenses are paid by King Mountain and recorded as an intercompany payable, and such amounts are repaid to King Mountain as cattle is sold.  In 2018, King Mountain paid $248,815 in Cattle wages and payroll taxes and $76,948 in operating costs.  In 2019, King Mountain paid $278,575 in wages and payroll taxes and $352,744 in operating costs; operating costs increased in 2019 due to purchases of bulls at a cost of $110,000 and fencing materials at a cost of $95,000.  In 2020, King Mountain paid $375,272 in wages and payroll taxes and $176,448 in operating costs.  The Debtor seeks to separate its cattle and tobacco operations, and therefore, no more than ninety days post-confirmation, Wheeler Cattle will be established as a separate legal entity, with its own accounting system and bank accounts.  Current intercompany payables representing debts owed by Wheeler Cattle will be transferred to the new entity.  All expenses and payroll will be processed through the new entity.  Cattle is usually sold twice a year, depending on the market, and accordingly, cash flow requirements will be projected for the upcoming six months.  The number of cattle sold will be based on estimated cash flow needs and the market price of beef.  Those proceeds would then be utilized to pay wages and operating expenses going forward.  Proceeds in excess of wage and operating costs will be used to repay King Mountain over a five year period starting January 1, 2022.  King Mountain has no plans to conduct business with Wheeler Cattle once the new legal entity is established.

E.     **The Debtor's Management**

Trina A. Wheeler, the Debtor's 100% owner, is the Manager and President of the Debtor.  Truman J. Thompson, the Chief Executive Officer and Chief Financial Officer, is also the Vice President of the Debtor.  Terryanna Blodgett is the Secretary of the Debtor.  Ms. Wheeler and Ms. Blodgett do not draw a salary from the Debtor, and there is no intention that either will in the future.  Mr. Thompson's current compensation for his full-time employment by the Debtor is $180,000 per year, plus quarterly bonuses of $12,500 awarded at the discretion of the Debtor's Manager.  Mr. Thompson's compensation by the Debtor is commensurate with other professionals possessing the

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

education, experience and knowledge of the regulatory issues unique to the Debtor's industry, and may be adjusted upward or downward on an annual basis to reflect cost of living and then current market conditions. The Debtor has no intent to alter this compensation structure in the foreseeable future.

**F.** **The Debtor's Employees**

The Debtor has more than 60 employees working in various positions across the Debtor's farming, production, sales, distribution, and administrative operations. All employees have been paid in full and will continue to be paid in full in accordance with their employment agreements.

**G.** **The Debtor's Regulatory Environment**

The Debtor is in a heavily regulated industry and must adhere to a myriad of regulations imposed under the MSA, the Escrow Statutes and state-specific complementary statutes, and federal regulations. The Debtor has been working to resolve its disputes with the TTB and State of New York and, prepetition, had entered into settlement agreements with the State of Indiana, State of South Carolina, FDA, and USDA. The Debtor has been in compliance with the Escrow Statutes in the states in which it currently sells its products, and the Debtor does not anticipate any further regulatory issues.

**H.** **The Debtor's Financial Statements**

Attached to this Disclosure Statement are the following:

        Exhibit A – The Debtor's Projections for 2021 through 2025
        Exhibit B – Assumptions Underlying the Projections
        Exhibit C – The Debtor's 2020 Financial Statements
        Exhibit D – The Debtor's 2019 Financial Statements
        Exhibit E – The Debtor's 2018 Financial Statements

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

## ARTICLE IV.
## SUMMARY OF PROPOSED PLAN OF REORGANIZATION

### A.  Explanation of Impaired and Unimpaired Claims

The term "Impaired" as used herein refers to those creditors to whom this Disclosure Statement (and the related Ballots and other materials delivered together herewith) are being furnished and who are entitled to accept or reject the Plan.  The Claims in Classes 1–10 are impaired under the Plan, and the holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

The term "Unimpaired" refers to those creditors or equity holders whose claims or interests remain unaltered by the reorganization effectuated by the Plan.  Because of this favorable treatment, these creditors are conclusively deemed to have accepted the Plan.  Accordingly, under Section 1126(f) of the Bankruptcy Code, it is not necessary to solicit acceptances from the holders of claims or interests in such classes.  No Classes are Unimpaired under the Plan and thus, no Class is conclusively deemed to have accepted the Plan with voting.

### B.  Classification of Claims and Interests

#### 1.  Unclassified Claims

The Bankruptcy Code automatically entitles certain types of claims to specific treatment.  Such claims are not impaired and are not entitled to vote on the Plan.  However, claimants holding such claims are entitled to object to the Plan, so long as the Plan's treatment of such claims is inconsistent with the requirements of the Bankruptcy Code.  Accordingly, the Debtor has not classified (i) Administrative Expense Claims, which are Allowed Claims for costs or expenses of the Chapter 11 Case that are allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, which will primarily be comprised of the allowed claims of Professional Persons, and amounts owed the US Trustee pursuant to 28 U.S.C. § 1930; or (ii) Priority Tax Claims, which unsecured income, employment, and other taxes described by 11 U.S.C. § 507(a)(8).  The treatment of Unclassified Claims is specified in the Plan.

#### 2.  Classified Claims and Equity Interests

Class 1:  Secured Claim of Alcohol and Tobacco Tax & Trade Bureau
Class 2:  Secured Claim of FIRST Insurance Funding

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

Class 3: Unsecured Claim of State of Indiana
Class 4: Unsecured Claim of State of South Carolina
Class 5: Unsecured Claim of the U.S. Department of Agriculture
Class 6: Unsecured Claim of the U.S. Food & Drug Administration
Class 7: Administrative Convenience Claims
Class 8: General Unsecured Claims
Class 9: Affiliate Claims
Class 10: Equity Interests

## C. <u>Treatment of Classified Claims and Equity Interests</u>.

As detailed in the Plan, each Allowed Claim in Classes 1–8 will be paid in full, with interest accruing at the rate specified in the Plan, if any, from income generated from the Debtor's business operations and from the proceeds of its Escrow Accounts, as specified in the Plan. The Holder(s) of the Equity Interests shall retain their interests following Confirmation and will continue to own, manage and operate the Debtor and its property. YOU ARE ENCOURAGED TO REVIEW THE TREATMENT OF YOUR CLAIM UNDER THE PLAN WITH CARE.

## ARTICLE V.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Plan constitutes a motion by the Debtor to authorize the Debtor to assume or reject, in its discretion, all executory contracts and unexpired leases of the Debtor except for those assumed or rejected prior to the date of the Confirmation Order. Assumption by the Debtor of an executory contract or unexpired lease means that the Debtor has elected to continue to perform the obligations under such contract or lease, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any. Pursuant to the Plan, each rejected agreement shall be deemed rejected as of the Effective Date.

## ARTICLE VI.
## TAX CONSEQUENCES

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim will depend, among other things, on (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the Holder of the Claim receives consideration in more than one tax year, (c) whether the Holder of the Claim is a resident of the United States, (d) whether all of the consideration by the Holder of the

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

Claim is deemed received by that Holder of the Claim as part of an integrated transaction, (e) whether the Holder of the Claim reports income using the accrual or cash method of accounting, and (f) whether the Holder of the Claim has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

The Debtor anticipates that the tax consequences of the Plan to the Debtor will have no effect on its ability to consummate the Plan. Because the Debtor is an S Corp, any tax consequences arising from implementation of the Plan will flow through to its owner and sole shareholder and will not be payable by the Debtor.

CIRCULAR 230 DISCLAIMER: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT (A) ANY U.S. FEDERAL TAX INFORMATION CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER RPARTY ANY TRANSACTION OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE DEBTORS' SOLICITING ACCEPTANCE OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT.

## ARTICLE VII.
## LIQUIDATION ANALYSIS

The Bankruptcy Code requires that a creditor with a right to vote accept the Plan, or, alternately, that the creditor receive under the Plan at least as much as it would receive if the debtor's assets were liquidated in and the proceeds distributed under a Chapter 7 liquidation. This is generally known as the "best interests" test. As set forth below, the Debtor believes that the Plan satisfies the standard.

To apply the test, the Debtor's assets are valued in the context of a distressed liquidation in a Chapter 7 case by a Chapter 7 trustee appointed by the Bankruptcy Court. The estimated values take into account the costs and expenses of the liquidation, and such additional administrative and priority claims that may result from conversion of the case to a Chapter 7 for the purpose of liquidation. Net liquidation proceeds would be paid to general unsecured creditors only to the extent funds are available after

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 23

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

20-01808-WLH11    Doc 198    Filed 03/17/21    Entered 03/17/21 16:30:20    Pg 23 of 30

secured creditors have been paid the full value of their collateral and priority creditors receive full payment on their claims.

In this case, the asserted secured claim of the TTB far exceeds the value of the Debtor's assets, even including the value of the Escrow Funds. On information and belief, and based on liquidations of similar qualified escrow accounts of NPM bankruptcy debtors, the Debtor projects a liquidation of the Debtor's reversionary rights in the funds in the Escrow Accounts would likely yield approximately $0.14 on the dollar. In this case, that would translate into a total return to TTB of less than $10 million on its $75 million claim. The TTB would also assert that its lien encumbers the balance of the Debtor's assets, the proceeds from the liquidation of which would also be payable to the TTB. The Debtor has not had any form of an appraisal performed on its operating assets and cannot state what the current liquidation value of the assets might be. However, the Debtor's estimate of the current liquidation value of its non-escrow account assets is less than $10 million, all of which the TTB would presumably claim as further proceeds of its collateral.

The Debtor's above estimate of a liquidation value incorporates, but is not limited to, the following facts and assumptions:

**Cash, Receivables, Bonds, Deposits and Prepayments.**

| Asset | Scheduled Value | Liquidation Value |
|---|---|---|
| Cash | $1,579,683.42 | $1,579,683.42 |
| Prepaid Insurance | $143,753.62 | $0 |
| Legal Retainers | $585,791.30 | $585,791.30 |
| Accounts Receivable | $1,733,435.39 | $1,213,404.77 |
| Tobacco NPM Corporate Surety Bonds | $779,000.00 | $250,000.00 |
| **TOTAL** | **$4,821,663.73** | **$3,628,879.49** |

- Cash on hand varies daily. Available cash would likely be less in the event of a conversion to chapter 7.
- There is little, if any, liquidation value associated with the Debtor's various insurance policies that have been prepaid and are termed through November 10, 2021.
- Accounts Receivable is discounted by 30% to account for assumptions of uncollectibility by a Chapter 7 trustee.

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 24

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

- The annual Non-Participating Tobacco MFS corporate surety bonds required by various selling states are exclusive to King Mountain. The Debtor is without information as to whether any portion of the tobacco bonds may be refunded if cancelled during the coverage period.

**Affiliate Receivables.**

| Receivable | Scheduled Value | Liquidation Value |
|---|---|---|
| Wheeler Logging | $4,245,580.95 | $0 |
| Wheeler Rock Products | $1,521,198.38 | $350,000.00 |
| Wheeler Fuel Distribution | $249,999.72 | $125,000.00 |
| Wheeler Pawn Stars | $282,993.20 | $125,000.00 |
| Wheeler Cattle | $1,968,337.14 | $250,000.00 |
| Mountain Tobacco Distributing | $4,760,351.18 | $0 |
| **TOTAL** | **$13,028,460.57** | **$850,000.00** |

- A more detailed discussion of the Affiliates, their respective relationships and transactions with the Debtor, and their projected ability to repay, is set forth in Section III.D hereof.
- As set forth in Section III.D, the Affiliates have varying cash flows and limited cash on hand, and certain Affiliates have proposed to repay the Debtor in full over specified time periods. A liquidation of the Debtor would result in only a fraction of the total anticipated repayment, due to the Affiliates' respective current financial circumstances.

**Inventory and Raw Materials.**

| Asset | Amount | Sale Price | Liquidation Value |
|---|---|---|---|
| Raw Tobacco | 385,344 pounds | $0.50/lb. | $192,672.00 |
| Packaging | $106,751 | 0% resale value | $0 |
| Raw Materials | $369,438 | 60% resale value | $221,662.80 |
| Processed Tobacco | $111,107 | 0% resale value | $0 |
| Cigarettes | 295,851 cartons | $4.00 profit per unit | $1,183,404.00 |
| Roll-Your-Own 16 oz. | 24 units | $3.00 profit per unit | $72.00 |
| Roll-Your-Own 6 oz. | 406 units | $1.50 profit per unit | $609.00 |
| **TOTAL** | | | **$1,598,419.80** |

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

- The Debtor's sale prices of raw tobacco and other raw materials take into consideration assumptions of a very limited market for raw tobacco and discount for necessary transportation of product to a processing facility.
- All packaging is custom made for King Mountain and may include certain logos or artistic elements exclusively licensed to King Mountain and, therefore, would have no value on the open market.
- All processed tobacco is processed into King Mountain's various proprietary blends that are the exclusive intellectual property of the Debtor and, therefore, any buyer would be prohibited from incorporating such processed tobacco into a third party product. Thus, processed tobacco on hand has no value on the open market.

**Fixed Assets.**

| Asset | Scheduled Value | Liquidation Value |
|---|---|---|
| Farming Assets | $4,703,705.29 | $1,996,500.00 |
| Office Furniture, Fixtures, and Equipment | $26,383.10 | $0 |
| Vehicles | $144,780.00 | $144,780.00 |
| Production Machinery and Equipment | $1,878,285.31 | $1,479,500.00 |
| **TOTAL** | **$6,753,153.70** | **$3,620,780.00** |

- The Debtor's fixed asset liquidation values are distinguished from the estimated values based on estimated useful life set forth in the Schedules. The fixed asset liquidation values consider inherent challenges of liquidating industry-specific fixed assets located on the Yakama Nation and the limited potential buyers of such assets on the open market.

**Liquidation Expenses.**

The gross amount of liquidation proceeds estimated above would be reduced by the costs and expenses that a chapter 7 trustee would incur in that process. The trustee would be entitled to a blended commission pursuant to § 326(a) of the Bankruptcy Code. In addition, the trustee would presumably engage an attorney and an accountant to assist in the liquidation process, as well as a firm to perform one or more liquidation sales of the fixed assets. It is impossible to estimate with any reliability as to what each of these expenses would total, but for purposes of this analysis the following amounts are included:

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

| Professional | Est. Expense Amount |
|---|---|
| Chapter 7 Trustee | $315,000 |
| Trustee's attorney | $200,000 |
| Trustee's accountant | $25,000 |
| Liquidation firm | $543,117[1] |
| **Total** | **$1,083,117** |

The estimated net liquidation recovery would be as follows:

| | |
|---|---|
| Gross liquidation proceeds: | $9,698,079 |
| Less: Liquidation expenses: | $1,083,117 |
| **Total:** | **$8,614,962** |

In the event of a liquidation, the TTB would receive payment on only a fraction of its almost $75 million claim, and all other creditors would receive no distributions whatsoever. Monthly payments to all creditors (including the TTB) would immediately cease. In contrast, the Plan provides that all creditors (other than the Class 9 Claims of Affiliates) will be paid 100% of their Allowed Claims. The Plan provides a much more favorable alternative for creditors and therefore satisfies the best interests of creditors test.

## ARTICLE VIII.
## RISK FACTORS

Distributions to Holders of Allowed Claims contemplated under the Plan are contingent upon assumptions, some or all of which could fail to materialize and preclude the Plan from becoming effective or reduce anticipated distributions. Most important, however, is that the Plan is subject to approval by the various classes of creditors entitled to vote on the Plan pursuant to the Bankruptcy Code and to confirmation of the Plan by the Bankruptcy Court. No assurance can be given that the Plan will be accepted by the requisite number and amount of creditors or confirmed by the court.

---

[1] $3,620,780 x 15% = $543,117

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 27

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

# ARTICLE IX.
## CONFIRMATION OF THE PLAN

## A.  **Voting Procedures**

A ballot to be used for voting your acceptance or rejection of the Plan of Reorganization is being mailed to you together with this Disclosure Statement and Plan. Holders of claims should read the instructions carefully, complete, date and sign the ballot, and transmit it in the envelope enclosed. IN ORDER TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE INDICATED ADDRESS BY THE TIME PROVIDED ON THE BALLOT. FAILURE TO VOTE OR A VOTE TO REJECT THE PLAN WILL NOT AFFECT THE TREATMENT TO BE ACCORDED A CLAIM OR INTEREST IF THE PLAN NEVERTHELESS IS CONFIRMED.

If more than one-half in number of claimants voting and at least two-thirds in amount of the allowed claims of such claimants in each class of claims vote to accept the Plan, such classes will be deemed to have accepted the Plan. For purposes of determining whether a class of claims has accepted or rejected the Plan, only the votes of those who have timely returned their ballots will be considered.

## B.  **Hearing on Confirmation**

The hearing on confirmation of the Plan will be set before the Honorable Whitman L. Holt, United States Bankruptcy Judge, in U.S. Bankruptcy Court for the Eastern District of Washington in Yakima. Notice of the time and date of that hearing will be provided. The Bankruptcy Court shall confirm the Plan at that hearing only if certain requirements, as set forth in § 1129 of the Bankruptcy Code, are satisfied.

## C.  **Feasibility**

The Debtor must also establish that confirmation of the Plan is not likely to be followed by the Debtor's liquidation, or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor, along with its professionals, analyzed the future prospects of the Debtor and its ability to meet its obligations under the Plan and have prepared projections (the "Projections") for the certain Plan periods. The Projections, and the significant assumptions upon which they are based, are attached as Exhibit A to this Disclosure Statement. Based on the Projections, the Debtor believes that Confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtor. To the extent necessary,

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

the Debtor will present additional evidence at the hearing on Confirmation in support of such a finding.

THE PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS INCLUDING, BUT NOT LIMITED TO, RECENT HISTORICAL OPERATING RESULTS AND THE TERMS OF THE PLAN OF REORGANIZATION ON FILE AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE PROJECTIONS. THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. NO INDEPENDENT AUDITOR HAS COMPILED OR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. THE PROJECTIONS MADE BY THE DEBTOR CONSTITUTES A FORWARD-LOOKING STATEMENT AS DEFINED IN 15 U.S.C. § 78u-5, AND ARE BASED UPON DATA AVAILABLE AS OF THE DATE OF THIS DISCLOSURE STATEMENT TO THE DEBTOR. IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN THE PROJECTIONS INCLUDE, BUT ARE NOT LIMITED TO, THE ACCURACY OF THE DATA THAT FORM THE BASIS FOR THE PROJECTIONS AND THE GENERAL ECONOMIC CONDITIONS THAT MAY EXIST AT THAT TIME.

THE DEBTOR DOES NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTOR DOES NOT INTEND TO AND DISCLAIMS ANY OBLIGATION TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE OR (B) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

FIRST AMENDED DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED PLAN OF
REORGANIZATION – Page 29

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178

## D. **Treatment of Dissenting Classes of Creditors**

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. Upon such a finding, the Bankruptcy Court may confirm the Plan despite the objections of a dissenting class. The Debtor has requested that the Court confirm the Plan even if creditors holding claims in impaired classes do not accept the Plan.

## E. **Effect of Confirmation of the Plan**

Confirmation of the Plan shall operate on the Effective Date as a discharge of the Debtor from all claims and indebtedness that arose before the Effective Date, except for those unclassified claims that the Debtor agrees to pay as a continuing obligation. All such discharged claims and indebtedness shall be satisfied by the cash payment or other consideration provided under the Plan. Upon Confirmation, all property of the Debtor shall be free and clear of all claims and interests of creditors, except as otherwise provided in the Plan or the order of the Bankruptcy Court confirming the Plan. The Reorganized Debtor shall be vested with all assets of the Debtor. The provisions of the Plan shall bind the Debtor and all other parties in interest, including any creditor of the Debtor, whether or not such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

## F. **Consequences of the Failure to Confirm the Plan**

In the event the Court declines to confirm the Debtor's Plan, a liquidation might ultimately result, either through a revised Plan under Chapter 11 or conversion of this Chapter 11 case to a bankruptcy under Chapter 7 of the Bankruptcy Code.

RESPECTFULLY SUBMITTED this 17th day of March, 2021.

KING MOUNTAIN TOBACCO COMPANY, INC.


_/s/ Truman J. Thompson_____
By: Truman J. Thompson
Its Chief Executive Officer and
    Corporate Vice President

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec16ed0178